Filed 12/17/15

# IN THE SUPREME COURT OF CALIFORNIA

CALIFORNIA BUILDING INDUSTRY ASSOCIATION,

        Plaintiff and Respondent,

        v.

BAY AREA AIR QUALITY MANAGEMENT DISTRICT,

        Defendant and Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

S213478

Ct.App. 1/5
A135335, A136212

Alameda County
Super. Ct. No. RG10548693

 

We granted review to address the following question: Under what circumstances, if any, does the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.) require an analysis of how existing environmental conditions will impact future residents or users of a proposed project?

In light of CEQA's text, statutory structure, and purpose, we conclude that agencies subject to CEQA generally are not required to analyze the impact of existing environmental conditions on a project's future users or residents. But when a proposed project risks exacerbating those environmental hazards or conditions that already exist, an agency must analyze the potential impact of such hazards on future residents or users. In those specific instances, it is the *project's* impact on the environment — and not the *environment's* impact on the project —

---

[1] All further statutory references are to this code unless otherwise indicated.

that compels an evaluation of how future residents or users could be affected by exacerbated conditions. Our reading is consistent with certain portions of administrative guidelines issued by the California Natural Resources Agency (Resources Agency), to whom we owe a measure of deference in a case such as this one.

Moreover, special CEQA requirements apply to certain airport, school, and housing construction projects. In such situations, CEQA requires agencies to evaluate a project site's environmental conditions regardless of whether the project risks exacerbating existing conditions. The environmental review must take into account — and a negative declaration or exemption cannot issue without considering — how existing environmental risks such as noise, hazardous waste, or wildland fire hazard will impact future residents or users of a project. That these exceptions exist, however, does not alter our conclusion that ordinary CEQA analysis is concerned with a project's impact on the environment, rather than with the environment's impact on a project and its users or residents.

Accordingly, we hold that CEQA does not require an agency to consider the impact of existing conditions on future project users except in the aforementioned circumstances. We reverse the Court of Appeal's judgment and remand for proceedings consistent with our decision.

I. BACKGROUND

The Bay Area Air Quality Management District (District) is a regional agency authorized to adopt and enforce regulations governing air pollutants from stationary sources such as factories, refineries, power plants, and gas stations in the San Francisco Bay Area. The District's purpose is to achieve and maintain compliance, in its regional jurisdiction, with state and federal ambient air quality

2

standards.  (Health & Saf. Code, §§ 39002, 40000, 40001, subd. (a), 40200.)[2]  To fulfill this purpose, the District monitors air quality, issues permits to certain emitters of air pollution, and promulgates rules to control emissions.  (*Id.*, §§ 40001, 42300, 42301.5, 42315.)

The Resources Agency, meanwhile, is the agency with primary responsibility for statewide implementation of CEQA.  It carries out this task in part by adopting administrative guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.)[3] that call for other agencies subject to CEQA, such as the District, to develop "thresholds of significance" for determining "the significance of environmental effects."  (Guidelines, § 15064.7, subd. (a).)  In 1999, the District published thresholds of significance for certain air pollutants, along with its own regional guidelines concerning the use of the thresholds and CEQA air quality issues in general, in order to guide those preparing or evaluating air quality impact analyses for projects in the San Francisco Bay Area.  The thresholds set levels at which toxic air contaminants (TACs) and certain types of particulate matter would be deemed environmentally significant.

A decade later, in 2009, the District drafted new proposed thresholds of significance partly in response to the Legislature's adoption of laws addressing greenhouse gases (GHGs).[4]  The District cited three factors to justify the new

---

[2]    Our recitation of the factual and procedural background is taken largely from the opinion of the Court of Appeal.

[3]    All references to "Guideline" or "Guidelines" are to the CEQA Guidelines in title 14 of the California Code of Regulations.

[4]    In 2006, the Legislature enacted the California Global Warming Solutions Act of 2006 (Health & Saf. Code, § 38500 et seq.), which seeks to achieve a reduction of GHG emissions to 1990 levels by 2020.  (*Id.*, § 38550.)  In 2008, the Legislature enacted the "Sustainable Communities and Climate Protection Act." (Stats. 2008, ch. 728.)

3

thresholds: (1) the existence of more stringent state and federal air quality standards that took effect after the District adopted its earlier thresholds, (2) the discovery that TACs present a greater health risk than previously thought, and (3) growing concerns over global climate change. A number of organizations, businesses, and local governments participated in public hearings, meetings, and workshops held by the District regarding the proposed revisions. One such participant was the California Building Industry Association (CBIA), a statewide trade association representing homebuilders, architects, trade contractors, engineers, designers, and other building industry professionals.

During the public hearing process, CBIA expressed concern that the District's proposed thresholds and guidelines were too stringent and would make it difficult to complete urban infill projects located near existing sources of air pollution.[5] CBIA claimed the proposed thresholds would require environmental impact reports (EIRs) for many more projects than before, and would result in nonapproval of other projects. If these infill projects were not feasible, CBIA argued, development would occur in more suburban areas and result in even more pollution from automobile commuter traffic.

The District was not persuaded. In June 2010, the District's board of directors passed resolution No. 2010-06, adopting new thresholds of significance for air pollutants, including the TAC "receptor thresholds" and thresholds for GHGs and $PM_{2.5}$ (particulate matter with a diameter of 2.5 microns or less). The District also published new CEQA air quality guidelines, which include the new

---

[5] An urban infill project refers to a project located on a site in an urbanized area that meets specified conditions, including that a specified percentage of the immediately adjacent parcels or adjoining parcels to the site are developed with qualified urban uses, or that the site itself has been previously developed for qualified urban uses. (See § 21061.3.)

4

thresholds and suggest methods of assessing and mitigating impacts found to be significant. (District, Cal Environmental Quality Act: Air Quality Guidelines (June 2010).)

CBIA filed a petition for writ of mandate challenging these thresholds. (Code Civ. Proc., § 1085.) After rejecting CBIA's contentions that state law preempts the thresholds, the superior court conducted a hearing on the merits of the following claims: (1) the District should have conducted a CEQA review of the thresholds before their promulgation because they constitute a "project" within the meaning of CEQA; (2) the TAC/PM$_{2.5}$ risks and hazards thresholds are arbitrary and capricious to the extent they unlawfully require an evaluation of the impacts the environment would have on a given project; (3) aspects of the thresholds are not based on substantial evidence; and (4) the thresholds fail the "rational basis" test because sufficient evidence does not exist for their approval.

The superior court determined that the District's promulgation of the 2010 thresholds was indeed a "project" under CEQA, and that the District was therefore bound to evaluate the thresholds' potential impact on the environment. Because the District issued the thresholds without the required CEQA review, the court entered judgment in favor of CBIA without addressing CBIA's other arguments. The court then issued a writ of mandate directing the District to set aside its approval of the thresholds, without addressing CBIA's claim that the District's TAC/PM$_{2.5}$ thresholds were arbitrary and capricious because they required an analysis of how a project would impact future residents or users. The court also awarded CBIA attorney fees under Code of Civil Procedure section 1021.5.

The Court of Appeal reversed. In ordering the superior court to vacate its writ of mandate, the Court of Appeal concluded, among other things, that the District's promulgation of the 2010 thresholds was not a project subject to CEQA review. It also rejected CBIA's various challenges to the substance of the

5

thresholds, including its challenge to the validity of the receptor thresholds — the thresholds for "new receptors" consisting of residents and workers who will be brought into the area as a result of a proposed project. CBIA had argued the receptor thresholds are invalid because CEQA does not require analysis of the impacts that existing hazardous conditions will have on a new project's occupants. The Court of Appeal more narrowly determined that the receptor thresholds have valid applications irrespective of whether CEQA requires an analysis of how existing environmental conditions impact a project's future residents or users, and therefore are "not invalid on their face." Finding that CBIA was "no longer a successful party," the Court of Appeal reversed the trial court's award of attorney fees and awarded the District its ordinary costs on appeal.

We then granted CBIA's petition for review, but limited the scope of our review to the following question: Under what circumstances, if any, does CEQA require an analysis of how existing environmental conditions will impact future residents or users (receptors) of a proposed project?[6]

## II. DISCUSSION

As this case turns on our interpretation of CEQA statutory provisions implemented through the Resources Agency's Guidelines, it is helpful at the outset to clarify the scope of our analysis before turning to the relevant statutory and Guidelines provisions. We review the Court of Appeal's interpretation of the statute de novo. (*Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 668.) Our goal in interpreting CEQA is to adopt the construction that best gives

---

[6] We declined CBIA's invitation to review whether the District's adoption of the 2010 thresholds constituted a project subject to environmental review under CEQA, and do not address the Court of Appeal's conclusion that the receptor thresholds have valid applications.

6

effect to the Legislature's intended purpose. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 45 (*Committee for Green Foothills*).) Consistent with that purpose, we interpret CEQA to afford the most thorough possible protection to the environment that fits reasonably within the scope of its text. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)

In construing the statute, we also consider the interpretation of the agency charged with its implementation. Even in the absence of quasi-legislative regulations,[7] we take into account the agency's interpretation when we independently construe the statute, and afford the agency's interpretation the deference that is appropriate under the circumstances. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*).) In deciding how much weight to give the agency's interpretation, we consider the agency's specialized knowledge and expertise — especially relevant where the statute at issue is a complex, technical one — and whether the agency adopted the interpretation pursuant to the Administrative Procedure Act. (*Yamaha*, at pp. 12-13.) Whether the Guidelines are binding or merely reflect the Resources Agency's interpretation of the statute, we should afford great weight to the Guidelines when interpreting CEQA, unless a provision is clearly unauthorized or erroneous under the statute. (*Committee for Green Foothills*, *supra*, 48 Cal.4th at p. 48, fn. 12.)

A. General Overview of CEQA

CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental

---

[7] Our court has not decided " 'whether the Guidelines are regulatory mandates or only aids to interpreting CEQA.' " (*Committee for Green Foothills*, *supra*, 48 Cal.4th at p. 48, fn. 12.)

impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment. (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285-286 (*Tomlinson*).)

To further these goals, CEQA requires that agencies follow a three-step process when planning an activity that could fall within its scope. (*Tomlinson*, *supra*, 54 Cal.4th at p. 286; see Guidelines, § 15002, subd. (k).) First, the public agency must determine whether a proposed activity is a "project," i.e., an activity that is undertaken, supported, or approved by a public agency and that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.)

Second, if the proposed activity is a project, the agency must next decide whether the project is exempt from the CEQA review process under either a statutory exemption (see § 21080) or a categorical exemption set forth in the CEQA Guidelines (see § 21084, subd. (a); Guidelines, § 15300 et seq.). If the agency determines the project is not exempt, it must then decide whether the project may have a significant environmental effect. And where the project will not have such an effect, the agency "must 'adopt a negative declaration to that effect.' " (*Tomlinson*, *supra*, 54 Cal.4th at p. 286, quoting § 21080, subd. (c); see Guidelines, § 15070.)[8]

Third, if the agency finds the project "may have a significant effect on the environment," it must prepare an EIR before approving the project. (§§ 21100,

---

[8] A negative declaration is a "written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064.)

subd. (a), 21151, subd. (a), 21080, subd. (d), 21082.2, subd. (d).) Given the statute's text, and its purpose of informing the public about *potential* environmental consequences, it is quite clear that an EIR is required even if the project's ultimate effect on the environment is far from certain. (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 110 [EIR is required " ' "whenever it can be *fairly argued* on the basis of substantial evidence that the project may have significant environmental impact," ' regardless of whether other substantial evidence supports the opposite conclusion"], disapproved on another ground in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3.) Determining environmental significance "calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." (Guidelines, § 15064, subd. (b).) The Guidelines encourage public agencies to develop and publish "thresholds of significance" (Guidelines, § 15064.7, subd. (a)), which generally promote predictability and efficiency when the agencies determine whether to prepare an EIR. (*Communities for a Better Environment*, at p. 111.)

When an agency prepares an EIR, it provides public officials and the general public with details about a proposed project's consequences. The EIR also lists the ways to potentially minimize any significant environmental effects, and presents alternatives to the project. (§ 21061; see § 21002.1, subd. (a).) By making this information available to decision makers and the public at a crucial moment when the merits of a project and its alternatives are under discussion, an EIR advances not only the goal of environmental protection but of informed self-government. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 [an EIR "give[s] the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government" ' "].)

The function CEQA assigns to an EIR, in fact, epitomizes the statute's focus on informed decisionmaking and self-government. The statute does not necessarily call for disapproval of a project having a significant environmental impact, nor does it require selection of the alternative "most protective of the environmental status quo." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 695.) Instead, when "economic, social, or other conditions" make alternatives and mitigation measures "infeasible," a project may be approved despite its significant environmental effects if the lead agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage. (§§ 21002, 21002.1, subd. (c); Guidelines, § 15093; see *City of Irvine v. County of Orange* (2013) 221 Cal.App.4th 846, 855.)

B.   Section 21083 and Guidelines Section 15126.2

Reflecting the need for further elaboration of these requirements in implementation, CEQA entrusts to the Governor's Office of Planning and Research (OPR) the responsibility of drafting the aforementioned Guidelines. Once OPR completes this process, the Secretary of the Resources Agency may certify and adopt the Guidelines in compliance with the Government Code. (§ 21083, subds. (a), (e), (f); see Guidelines, § 15000 et seq.)[9] Section 21083

---

[9]      Section 21083 also directs OPR to recommend, at least every two years, amendments to the Guidelines. The statute likewise directs the Resources Agency to certify and adopt Guidelines and amendments thereto at least every two years. (§ 21083, subd. (f).) Prior to final certification and adoption of the Guidelines and Guidelines amendments, the Secretary of the Resources Agency makes the proposed language available to the public and provides for at least a 45-day written comment period and public hearings on the proposals. (§ 21083, subds. (e), (f); Gov. Code, §§ 11346.4, 11346.5, 11346.8.) These public comments are considered by the secretary in determining whether to adopt the OPR's proposed amendments.

10

provides the Guidelines "shall include objectives and criteria for the orderly evaluation of projects and the preparation of environmental impact reports and negative declarations in a manner consistent with [CEQA]." (§ 21083, subd. (a).) The Guidelines therefore serve to make the CEQA process tractable for those who must administer it, those who must comply with it, and ultimately, those members of the public who must live with its consequences.

What the Guidelines are supposed to contain is also specified in section 21083. The Guidelines "shall specifically include criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment.' " (§ 21083, subd. (b) (section 21083(b)).) Most relevant is the provision's express command that "*[t]he criteria shall require a finding that a project may have a 'significant effect on the environment' if one or more of*" a set of certain conditions exist. (*Ibid.*, italics added.) These conditions include a "proposed project['s] . . . potential to degrade the quality of the environment, curtail the range of the environment, or to achieve short-term, to the disadvantage of long-term, environmental goals" and circumstances where a project's "possible effects . . . are individually limited but cumulatively considerable." (*Id.*, subd. (b)(1), (2).) Section 21083, subdivision (b)(2) defines "cumulatively considerable" as the "incremental effects of an individual project . . . when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." The final condition listed under section 21083 is where "[t]he environmental effects of a project will *cause substantial adverse effects on human beings, either directly or indirectly*." (§ 21083, subd. (b)(3) (section 21083(b)(3)), italics added.)

Through these Guidelines, the Resources Agency gives public agencies a more concrete indication of how to comply with CEQA — including whether such agencies must determine the impact of existing environmental conditions on a

11

proposed project's residents and users. The Guidelines also prove consequential given that under section 21082, CEQA requires agencies subject to its provisions — such as the District — to adopt "objectives, criteria and procedures" for evaluating projects and preparing environmental documents. These agencies may, in turn, adopt the Guidelines by reference to fulfill their statutory responsibilities. (§ 21082; see Guidelines, § 15022, subds. (a), (d).) The Guidelines, in effect, enable the Resources Agency to promote consistency in the evaluation process that constitutes the core of CEQA. And because these Guidelines allow the Resources Agency to affect how agencies comply with CEQA, they are central to the statutory scheme. (Cf. *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566 [noting that certain "statutory and judicial concepts are carried forward in the Guidelines"]; *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 171 ["[B]ecause [CEQA] *specifically incorporates the Guidelines pertaining to categorical exemptions*, the philosophy and policies underlying the categorical exemptions should be paramount" (italics added)].)

Especially relevant to the question before us is one such provision of the Guidelines, section 15126.2, subdivision (a) (Guidelines section 15126.2(a)). Promulgated pursuant to section 21083 of the statute, Guidelines section 15126.2(a) reflects the Resources Agency's interpretation of CEQA. It calls for an EIR to "identify and focus on the significant environmental effects of the proposed project," including "any significant environmental effects the project might cause *by bringing development and people into the area affected*." (Italics added.) The Guideline then continues by providing an example, indicating that an EIR for a project "on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision" because that "subdivision would have the effect of attracting people to the location and

12

exposing them to the hazards found there." (*Ibid*.) The Guideline likewise calls for an EIR to "evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas." (*Ibid.*)

Guidelines section 15126.2(a), in short, indicates that CEQA generally requires an evaluation of environmental conditions and hazards existing on a proposed project site if such conditions and hazards may cause substantial adverse impacts to future residents or users of the project. Given that this Guideline seems to furnish a specific answer to the question before us, it is perhaps not surprising that the District and CBIA dispute its validity.[10]

C.     CEQA's General Rule

The District and CBIA disagree about this Guideline because they diverge on how to interpret section 21083. The core of their disagreement is what the statute means when it provides that "a project may have a 'significant effect on the environment' " (§ 21083(b)) if "[t]he environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (§ 21083(b)(3).) The District reads the statutory language to encompass the question of how existing environmental conditions or hazards in the vicinity of a proposed project might substantially, and adversely, impact future residents or users. Under this view, when existing environmental conditions on or near the proposed project site pose hazards to humans brought to the site by the project, the

_____

[10]     OPR represents it will not suggest any changes to Guidelines section 15126.2 pending this court's decision in the instant case. (OPR, Possible Topics to be Addressed in the 2014 CEQA Guidelines Update (Dec. 30, 2013) § IV, p. 7.)

13

project may have potentially significant environmental effects requiring evaluation.

CBIA takes a contrasting view. It asserts that section 21083(b)(3)'s reference to the "environmental effects of a project" only applies to a project's effects on the environment, and does not include the effects of a site's environment on a project, or on its residents and users.[11] CBIA contends that the District's construction contradicts CEQA's clear language and distorts the intent of the statutory scheme, and that adopting it would "impose[ ] procedural or substantive requirements beyond those explicitly stated" in CEQA or its Guidelines. (§ 21083.1.)

In light of CEQA's text and structure, we conclude that CEQA generally does not require an analysis of how existing environmental conditions will impact a project's future users or residents. The District emphasizes, correctly, that CEQA addresses human health and safety. Section 21083(b)(3)'s express language, for example, requires a finding of a " 'significant effect on the environment' " (§ 21083(b)) whenever the "environmental effects of a project will cause substantial adverse effects *on human beings*, either directly or indirectly." (§ 21083(b)(3), italics added.) And the Legislature has made clear — in declarations accompanying CEQA's enactment — that public health and safety are of great importance in the statutory scheme. (E.g., §§ 21000, subds. (b), (c), (d), (g), 21001, subds. (b), (d) [emphasizing the need to provide for the public's

---

[11] CBIA uses the term "reverse CEQA" to refer to an evaluation of how existing conditions might impact a project's future residents or users. We find this term misleading and inapt. Because CEQA does sometimes require analysis of the effect of existing conditions on a project's future residents or users, such analysis is not the "reverse" of what CEQA mandates. (See pp. 21-22, *post*.)

14

welfare, health, safety, enjoyment, and living environment].)  Still, the District reads too much into the phrase "environmental effects of a project."

The District's reading of that phrase goes too far despite all the reasons for us to give the Resources Agency's interpretation — an interpretation broadly consistent with that of the District — special weight.  The statute does not provide enough of a basis to suggest that the term "environmental effects" as used in this context is meant, as a general matter, to encompass these broader considerations associated with the health and safety of a project's future residents or users.  Section 21060.5 defines "environment" as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.)  Given the text of section 21083 and other relevant provisions of the statutory scheme to which it belongs — including CEQA's statute-wide definition of "environment" — the phrase in question is best interpreted as limited to those impacts on a project's users or residents that arise from the project's effects on the environment.  Even if one reads into CEQA's definition of "environment" a concern with people — a reading that, notwithstanding section 21060.5, is conceivable given the Legislature's interest in public health and safety — section 21083 does not contain language directing agencies to analyze the environment's effects *on* a project.  Requiring such an evaluation in all circumstances would impermissibly expand the scope of CEQA.

The rest of the statute's relevant provisions underscore why.  Despite the statute's evident concern with protecting the environment and human health, its relevant provisions are best read to focus almost entirely on how projects affect the environment.  (E.g., §§ 21060.5 [defining environment], 21068 [" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment"], 21083(b)(1) [directing that a project shall be found

15

to have a " 'significant effect on the environment' " if it "has the potential to degrade the quality of the environment"].)  Indeed, the key phrase "significant effect on the environment" is explicitly defined by statute in a manner that does not encompass the environment's effect on the project.  (§ 21068 [" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment"].)  And nowhere in the statute is there any provision that cuts against the specificity of that definition by plainly delegating power for the agency to determine whether a project must be screened on the basis of how the environment affects its residents or users.

Consider the alternative:  stretching the definition so it encompasses the analysis of how environmental conditions could affect a project's future residents — the kind of analysis that the Guidelines purport to require — would require us to define "environmental effects of a project" in a manner that all but elides the word "environmental."  That approach, in turn, would allow the phrase to encompass nearly any effect a project has on a resident or user.  Given the sometimes costly nature of the analysis required under CEQA when an EIR is required, such an expansion would tend to complicate a variety of residential, commercial, and other projects beyond what a fair reading of the statute would support.

With this holding in mind, we must distinguish between requirements that consider the *environment's* effects on a project and those that contemplate the *project's* impacts on the existing environment.  The former, in light of our analysis of section 21083 and other relevant language in CEQA, are invalid.  The latter, however, are valid and entirely consistent with CEQA's concerns about environmental protection, public health, and deliberation.  Moreover, and

16

consistent with CEQA's general rule, we note that the statute does not proscribe consideration of existing conditions.[12] In fact, CEQA calls upon an agency to evaluate existing conditions in order to assess whether a project could exacerbate hazards that are already present. Accordingly, we find that the following sentences of Guidelines section 15126.2(a) — challenged by CBIA as unauthorized under the statute[13] — are valid under CEQA: "The EIR shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected. . . . Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas."

---

[12] Nor, for that matter, does CEQA *prohibit* an agency from considering — as part of an environmental review for a project it proposes to undertake — how existing conditions might impact a project's future users or residents. Indeed, it appears that such an analysis had been widely understood to be an integral aspect of CEQA review for three decades. (OPR, CEQA: The California Environmental Quality Act: Law and Guidelines 1984 (Jan. 1984) Discussion of amendments, Guidelines former § 15126, p. 137 [dismissing as early as 1983 the alleged "artificial distinction" between examining "the effects of the project on the environment" and "the effects of the environment on the project"].)

[13] CBIA contends that the following sentences of Guidelines section 15126.2(a) are invalid: "The EIR shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected. For example, an EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. The subdivision would have the effect of attracting people to the location and exposing them to the hazards found there. Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas." (Guidelines, § 15126.2(a).)

17

These sentences are valid to the extent they call for evaluating a project's potentially significant *exacerbating* effects on existing environmental hazards — effects that arise because the project brings "development and people into the area affected." Both CEQA and the Guideline call explicitly for an analysis of a project's effects *on the environment*. In this respect, the Resources Agency's directive is consistent with section 21083(b)(3)'s plain language, as the Guideline contemplates analyzing those existing conditions impacted directly by a project's siting or development. Moreover, both sentences reflect the Resources Agency's reasonable construction of CEQA. We defer to that interpretation, finding it not to be proscribed by the statutory language.

Indeed, the statutory language emphasizes how the analysis of a project's potential to exacerbate existing conditions is not an exception to, but instead a consequence of, CEQA's core requirement that an agency evaluate a project's impact on the environment. An example may be illuminating. Suppose that an agency wants to locate a project next to the site of a long-abandoned gas station. For years, that station pumped gasoline containing methyl tertiary-butyl ether (MTBE), an additive — now banned by California — that can seep into soil and groundwater. (See *Western States Petroleum Assn. v. State Dept. of Health Services* (2002) 99 Cal.App.4th 999, 1003; Cal. Code Regs., tit. 13, § 2262.6, subd. (a) [prohibiting the addition of MTBE to gasoline starting Dec. 31, 2003].) Without any additional development in the area, the MTBE might well remain locked in place, an existing condition whose risks — most notably the contamination of the drinking water supply — are limited to the gas station site and its immediate environs. But by virtue of its proposed location, the project threatens to disperse the settled MTBE and thus exacerbate the existing contamination. The agency would have to evaluate the existing condition — here, the presence of MTBE in the soil — as part of its environmental review. Because

18

this type of inquiry still focuses on the *project's impacts on the environment* — how a project might worsen existing conditions — directing an agency to evaluate how such worsened conditions could affect a project's future users or residents is entirely consistent with this focus and with CEQA as a whole.

These Guideline sentences reflect the Resources Agency's reading of CEQA — a reading made clear in 2009 when the agency added the final sentence of Guidelines section 15126.2(a). (Cal. Natural Resources Agency, Final Statement of Reasons for Regulatory Action: Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB97 (Dec. 2009) pp. 42-43 ["[A] lead agency should analyze the effects of bringing development to an area that is susceptible to hazards such as flooding and wildfire, both as such hazards currently exist or may occur in the future. . . . [¶] . . . [T]he addition to [Guidelines section 15126.2(a)] contemplates hazards which the presence of a project could exacerbate"].)

Two factors add weight to the Resources Agency's interpretation of the statute. First, an agency's expertise and technical knowledge, especially when it pertains to a complex technical statute, is relevant to the court's assessment of the value of an agency interpretation. (*Yamaha*, *supra*, 19 Cal.4th at p. 12.) Because of its longstanding statutory role as the agency with primary responsibility for statewide implementation of CEQA, the Resources Agency is precisely the kind of agency that accumulates specialized knowledge of such an intricate statute and the trade-offs involved in its implementation. (Cf. *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572-573 [administrative agency implementing CEQA merits deference]; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1108 (dis. opn. of Moreno, J.) ["deference is particularly owing when the statutory interpretation implicates administrative agency expertise"].) The statute itself recognizes the primacy of the Resources Agency: the agency must certify

19

and adopt the Guidelines that bind public agencies as they navigate the often technical and complex waters of CEQA. (§ 21083, subd. (e); see Guidelines, § 15000 ["These Guidelines are binding on all public agencies in California"].)

Second, the Resources Agency adopted the Guidelines pursuant to the California Administrative Procedure Act (APA). (Gov. Code, § 11340 et seq.) The APA subjects potential agency interpretations to procedural safeguards that foster accuracy and reliability. (See *Yamaha*, *supra*, 19 Cal.4th at p. 13.) Section 21083 prohibits the Resources Agency from adopting the Guidelines without certain of these APA safeguards, including notice, public discussion, and an opportunity to comment. (§ 21083, subd. (e); Gov. Code, §§ 11346.4, 11346.5, 11346.8.) The Guidelines are a product of this process, promulgated in accordance with these important safeguards. (See, e.g., Cal. Reg. Notice Register 97, No. 41-Z, pp. 1956-1957 [notice of proposed regulatory action, setting forth the dates and specifications of public hearings, and inviting comments from interested persons].) As a result, the Resources Agency's interpretation, as embodied in Guidelines section 15126.2(a), carries additional weight.

But such weight may sometimes fail to tip the interpretive scale. While these two sentences withstand scrutiny, the remainder of the challenged portion of the Guidelines goes astray, imposing a requirement too far removed from evaluating a project's impacts on the environment. Accordingly, whatever deference we owe to the Resources Agency's interpretation is not enough to save the following sentences of section 15126.2(a), which we find clearly erroneous and unauthorized under CEQA: "[A]n EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. The subdivision would have the effect of attracting people to the location and exposing them to the hazards found there." These sentences are

20

inconsistent with section 21083's consideration of significant environmental effects.

D.  Exceptions to the General Rule

Although CEQA does not generally require an evaluation of the effects of existing hazards on future users of the proposed project, it calls for such an analysis in several specific contexts involving certain airport (§ 21096) and school construction projects (§ 21151.8), and some housing development projects (§§ 21159.21, subds. (f), (h), 21159.22, subds. (a), (b)(3), 21159.23, subd. (a)(2)(A), 21159.24, subd. (a)(1), (3), 21155.1, subd. (a)(4), (6).

Section 21096 requires a lead agency to use certain technical resources when addressing airport-related safety hazards and noise problems in EIRs for projects near airports (§ 21096, subd. (a)), and prohibits a lead agency from adopting a negative declaration without considering "whether the project will result in a safety hazard or noise problem for persons using the airport or for persons residing or working in the project area."  (§ 21096, subd. (b).)  Section 21151.8 mandates certain methods to determine if school sites are located on or near sources of hazardous substances or waste or in close proximity to freeways or other operations that might emit hazardous emissions.  (§ 21151.8, subd. (a), (a)(2)(A) [detailing health and safety risks and hazardous conditions and setting forth the process for consulting with air quality districts and other agencies].)

A separate cluster of statutes limits the availability of CEQA exemptions where future residents or users of certain housing development projects may be harmed by existing conditions.  These limits on exemptions extend to projects located on sites that will expose future occupants to certain hazards and risks — including the release of hazardous substances and sites subject to wildland fire, seismic, landslide or flood hazards — unless (in some cases) the hazards and risks can be removed or mitigated to insignificant levels.  (E.g., §§ 21159.21, subds. (f),

21

(h), 21159.22, subds. (a), (b)(3) [agricultural employee housing], 21159.23, subd. (a)(2)(A) [affordable to low-income housing], 21159.24, subd. (a)(1), (3) [infill housing].)  Transit priority projects are treated in similar fashion, subject to the same health and safety constraints that limit exemptions for other housing projects.  (E.g., § 21155.1, subd. (a)(4), (6) [project meeting same environmental criteria, including where the project site is not subject to onsite hazardous substances or fire or seismic risk, may qualify as a sustainable communities project, which excuses further CEQA compliance].)  Like the statutes governing certain school and airport construction projects, these statutes reflect an express legislative directive to consider whether existing environmental conditions might harm those who intend to occupy or use a project site.

The District argues that these statutes "demonstrate the legislative understanding that exposing people to [certain existing hazards and] conditions is a potentially significant environmental effect."  We find otherwise:  these statutes constitute specific exceptions to CEQA's general rule requiring consideration only of a project's effect on the environment, not the environment's effects on project users.  Accordingly, we cannot, as the District urges, extrapolate from these statutes an overarching, general requirement that an agency analyze existing environmental conditions whenever they pose a risk to the future residents or users of a project.

E.  Previous Case Law

CBIA cites four Court of Appeal decisions in support of its position:  *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889; *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604; and *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455.

22

The conclusion that we reach today is not inconsistent with these cases, all of which implicitly held that CEQA does not *generally* require an agency to analyze how existing hazards or conditions might impact a project's users or residents. Further, these Courts of Appeal did not have occasion to consider — and therefore did not rule out — the exceptions to the general rule that we elucidate here.

III. DISPOSITION

For the foregoing reasons, we hold that CEQA does not generally require an agency to consider the effects of existing environmental conditions on a proposed project's future users or residents. What CEQA does mandate, consistent with a key element of the Resources Agency's interpretation, is an analysis of how a project might exacerbate existing environmental hazards. CEQA also requires such an analysis where the project in question falls into certain specific statutory categories governing school, airport, and certain housing projects under sections 21151.8, 21096, 21159.21, 21159.22, 21159.23, 21159.24, and 21155.1. Accordingly, we find Guidelines section 15126.2(a) valid only in part.

The Court of Appeal denied CBIA's request for writ relief on a variety of grounds, and it reversed the superior court's decision awarding CBIA attorney fees. But the court's analysis of CBIA's petition for writ relief did not address certain potentially important arguments for and against such relief in light of CEQA's requirements as we interpret them here. We reverse the Court of Appeal's judgment and remand so that it may have an opportunity to address these issues to the extent necessary in light of today's holding.

**CUÉLLAR, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

24

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Building Industry Association v Bay Area Air Quality Management District
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 218 Cal.App.4th 1171
**Rehearing Granted**

_____

**Opinion No.** S213478
**Date Filed:** December 17, 2015
_____

**Court:** Superior
**County:** Alameda
**Judge:** Frank Roesch

_____

**Counsel:**

Brian C. Bunger, Randi L. Wallach; Shute, Mihaly & Weinberger, Ellison Folk and Erin B. Chalmers for Defendant and Appellant.

Matthew Vespa and Kevin P. Bundy for Sierra Club, Center for Biological Diversity, the Natural Resources Defense Council and the Planning and Conservation League as Amici Curiae on behalf of Defendant and Appellant.

Burke, Williams & Sorensen, Thomas B. Brown and Matthew D. Visick for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Kurt R. Wise, Barbara B. Baird, Veera Tyagi and Ruby Fernandez for South Coast Air Quality Management District as Amicus Curiae on behalf of Defendant and Appellant.

Earthjustice and Adriano L. Martinez for Communities for a Better Environment as Amicus Curiae on behalf of Defendant and Appellant.

Wittwer Parkin, William P. Parkin and Jonathan Wittwer for California Chapter of the American Planning Association and California Association of Environmental Professionals as Amici Curiae on behalf of Defendant and Appellant.

Thomas E. Montgomery, County Counsel, and Paula Forbis, Deputy County Counsel, for San Diego County Air Pollution Control District as Amicus Curiae on behalf of Defendant and Appellant.

Paul Campos; Cox, Castle & Nicholson, Michael H. Zischke, Andrew B. Sabey and Christian H. Cebrian for Plaintiff and Respondent.

1

**Page 2 – counsel continued – S213478**

**Counsel:**

Perkins Coie, Stephen L. Kostka and Geoffrey L. Robinson for Center for Creative Land Recycling, Burbank Housing, Bridge Housing, First Community Housing, Nonprofit Housing Association of Northern California, San Francisco Housing Action Coalition, California Infill Builders Federation, Bay Area Council, Bay Planning Coalition, East Bay Leadership Council, Orange County Business Council, San Mateo County Economic Development Association and Silicon Valley Leadership Group as Amici Curiae on behalf of Plaintiff and Respondent.

Miller Starr Regalia, Arthur F. Coon and Matthew C. Henderson for League of California Cities , County of Tulare, County of Kings and County of Solano as Amice Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ellison Folk
Shute, Mihaly & Weinberger
396 Hayes Street
San Francisco, CA  94102
(415) 552-7272

Andrew B. Sabey
Cox, Castle & Nicholson
555 California Street, 10th Floor
San Francisco, CA  94104-1513
(415) 262-5100