CUÉLLAR, J.,
Concurring and Dissenting.—A local government is entitled to reimbursement from the state when the Legislature or a state agency requires it to provide new programs or increased service. (Cal. Const., art. XIII B, § 6, subd. (a).) But one crucial exception coexists with this rule. It applies where the new program or increased service is mandated by a federal statute or regulation. (Gov. Code, § 17556, subd. (c).) We consider in this case whether certain conditions to protect water quality included in a permit from the Regional Water Quality Control Board, Los Angeles Region (Regional Board or Board)—specifically, installation and maintenance of trash receptacles at transit stops, as well as inspections of certain commercial and industrial facilities and construction sites—constitute state mandates subject to reimbursement, or federal mandates within the statutory reimbursement exception.
What the majority concludes is that federal law did not compel imposition of the conditions, and that the local agencies would not necessarily have been required to comply with them had they not been imposed by the state. In doing so, the majority upholds and treats as correct a decision by the Commission on State Mandates (the Commission) that is flawed in its approach and far too parsimonious in its analysis. This is no small feat: not *773 only must the majority discount any expertise the Regional Board might bring to bear on the mandate question (see maj. opn., ante, at pp. 768-769), but it must also overlook the Commission’s reliance on an overly narrow analytical framework and prop up the Commission’s decision with evidence on which the agency could have relied, rather than that on which it did (see id. at pp. 770-772).
Moreover, when the majority considers whether the permit conditions are indeed federally mandated, it purports to apply de novo review to the Commission’s legal determination. (See maj. opn., ante, at pp. 762, 768, 770.) What it actually applies seems far more deferential to the Commission’s decision—something akin to substantial evidence review—despite the Commission’s own failure in affording deference to the Regional Board and, more generally, its reliance on the wrong decisionmaking framework. (Cf. People v. Barnwell (2007) 41 Cal.4th 1038, 1052 [63 Cal.Rptr.3d 82, 162 P.3d 596] [“A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact could have relied in reaching the conclusion in question”].) Indeed, what the majority overlooks is that the Commission itself should have considered the effect of the evidence on which the majority now relies in deciding whether the challenged permit conditions were necessary to comply with federal law. And in doing so, the Commission should have extended a measure of deference to the Regional Board’s expertise in administering the statutory scheme. (See County of Los Angeles v. State Water Resources Control Bd. (2006) 143 Cal.App.4th 985, 997 [50 Cal.Rptr.3d 619] (State Water Board).)
Because the Commission failed to do so, and because the Commission’s interpretation of the federal Clean Water Act (the CWA; 33 U.S.C. § 1251 et seq.) failed to account for the complexities of the statute, I would reverse the Court of Appeal’s judgment and remand with instructions for the Commission to reconsider its decision. So I concur in the majority’s judgment reversing the Court of Appeal, but dissent from its conclusion upholding the Commission’s decision rather than remanding the matter for further proceedings.
I.
To determine whether it is the state rather than local governments that should bear the entirety of the financial burden associated with a new program or increased service, the Commission must examine the nature of the federal scheme in question. That scheme is the CWA, a statute Congress amended in 1972 to establish the National Pollutant Discharge Elimination System (the NPDES) as a means of achieving and enforcing limitations on *774 pollutant discharges. (See EPA v. State Water Resources Control Board (1976) 426 U.S. 200, 203-204 [48 L.Ed.2d 578, 96 S.Ct. 2022].) The role envisioned for the states under the NPDES is a major one, encompassing both the opportunity to assume the primary responsibility for the implementation and enforcement of federal effluent discharge limitations by issuing permits as well as the discretion to enact requirements that are more onerous than the federal standard. (See 33 U.S.C. §§ 1251(b), 1342(b).)
But states undertaking such implementation must do so in a manner that complies with regulations promulgated by the Environmental Protection Agency (the EPA), as well as the CWA’s broad provisions (including the “maximum extent practicable” standard (33 U.S.C. § 1342(p)(3)(B)(iii))), and subject to the EPA’s continuing revocation authority (see id., § 1342(c)(3)). Despite the breadth of the requirements the statute imposes on states assuming responsibility for permitting enforcement and the expansive nature of the EPA’s revocation authority, neither the statute nor its implementing regulations include a safe harbor provision establishing a minimum level of compliance with the federal standard—an absence the majority tacitly acknowledges. (See maj. opn., ante, at p. 767 [“the Regional Board was not required by federal law to impose any specific permit conditions”].) Instead, implementation of the federal mandate requires the state agency—here, the Regional Board—to exercise technical judgments about the feasibility of alternative permitting conditions necessary to achieve compliance with the federal statute.
With no statutory safe harbor that the Regional Board could have relied on to ensure the EPA’s approval of the state permitting process, the Board interpreted the federal standard in light of the statutory text, implementing regulations, and its technical appraisal of potential alternatives. In discharging its own role, the Commission was then bound to afford the Regional Board a measure of “sister-agency” deference. (See Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [explaining that “the binding power of an agency’s interpretation of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation”].) In this case, the Regional Board informed localities that, in its view, the various permit conditions it imposed would satisfy the maximum extent practicable standard. The EPA agreed the requirements were within the scope of the federal standard. The Regional Board’s judgment that these conditions will control pollutant discharges to the extent required by federal law is at the core of the agency’s institutional expertise. That expertise merits a measure of deference because the Regional Board’s ken includes not only its greater familiarity with the CWA (relative to other entities), but also technical knowledge relevant to judgments about the water quality consequences of particular permitting conditions relevant to the provisions of the *775 CWA. (See, e.g., 33 U.S.C. § 1342(p)(3)(B)(iii) [requiring that permits include “management practices, control techniques and system, design and engineering methods, and such other provisions as ... the State determines appropriate for the control of such pollutants”].) Casting aside the Regional Board’s expertise on the issue at hand, the majority nonetheless upholds the Commission’s ruling.
Remand to the Commission would have been the more appropriate course for multiple reasons. First, the Commission applied the wrong framework for its analysis. It failed to consider all the evidence relevant to whether the permit conditions were necessary for compliance with federal law. The Commission compounded its error by relying on an interpretation of the CWA that misconstrues the federal statutory scheme governing the state permitting process.
In particular, the Commission treated the problem as essentially a simple matter of searching the statutory text and regulations for precisely the same terms used by the Regional Board’s permit conditions. Unless the requirement in question is referenced explicitly in a federal statutory or regulatory provision, the Commission’s analysis suggests, the requirement cannot be a federal mandate. With respect to trash receptacles, the Commission stated: “Because installing and maintaining trash receptacles at transit stops is not expressly required of cities or counties or municipal separate storm sewer dischargers in the federal statutes or regulations, these are activities that ‘mandate costs that exceed the mandate in the federal law or regulation.’ ” And with respect to industrial facility inspections, the Commission said this: “Inasmuch as the federal regulation (40 CFR § 122.26 (c)) authorizes coverage under a statewide general permit for the inspections of industrial activities, and the federal regulation (40 CFR § 122.26 (d)(2)(iv)(D)) does not expressly require those inspections to be performed by the county or cities (or the ‘owner or operator of the discharge’) the Commission finds that the state has freely chosen to impose these activities on the permittees.” (Fn. omitted.)
Existing law does not support this method of determining what constitutes a federal mandate. Instead, our past decisions emphasize the need to consider the implications of multiple statutory provisions and broader statutory context when interpreting federal law to determine if a given condition constitutes a federal mandate. (See City of Sacramento v. State of California (1990) 50 Cal.3d 51, 76 [266 Cal.Rptr. 139, 785 P.2d 522] (City of Sacramento); see also San Diego Unified School Dist. v. Commission on State Mandates (2004) 33 Cal.4th 859, 890 [16 Cal.Rptr.3d 466, 94 P.3d 589] [“challenged state rules or procedures that are intended to implement an applicable federal law—and whose costs are, in context, de minimis—should be treated as part and parcel of the underlying federal mandate” (italics added)].) In contrast, *776 the Commission’s overly narrow approach to determining what constitutes a federal mandate risks creating a standard that will never be met so long as the state retains any shred of discretion to implement a federal program. It cannot be that so long as a federal statute or regulation does not expressly require every permit term issued by a state agency, then the permit is a state, rather than a federal, mandate. But this is precisely how the Commission analyzed the issue—an analysis that, remarkably, the majority does not even question. Instead, the majority combs the record for evidence that could have supported the result the Commission reached. In so doing, the majority implicitly acknowledges that the Commission’s approach to resolving the question at the heart of this case was deficient.
But if the Commission applied the wrong framework for its analysis, the right course is to remand. Doing so would obviate the need to cobble together scattered support for a decision by the Commission that was premised, in the first instance, on the Commission’s own misconstrual of the inquiry before it. Instead, we should give the Commission an opportunity to reevaluate its conclusion in light of the entire record and to, where appropriate, solicit further information from the parties to shed light on what permit conditions are necessary for compliance with federal law.
The potential consequences of allowing the Commission to continue on its present path are quite troubling. For if the law were as the Commission suggests, the state would be unduly discouraged from participating in federal programs like the NPDES—even though participation might otherwise be in California’s interest—if the state knows ex ante that it will be unable to pass along the expenses to the local areas that experience the most costs and benefits from the mandate at issue. Our law on unfunded mandates does not compel such a result. Nor is there an apparent prudential rationale in support of it.
The Commission’s approach also fails to appreciate the EPA’s role in implementing (through its interpretation and enforcement of the CWA) statutory requirements that the CWA describes in relatively broad terms. Indeed, what may be “practicable” in Los Angeles may not be in San Francisco, much less in Kansas City or Detroit. (See Building Industry Assn. of San Diego County v. State Water Resources Control Bd. (2004) 124 Cal.App.4th 866, 889 [22 Cal.Rptr.3d 128] (Building Industry Assn.) [explaining that “the maximum extent practicable standard is a highly flexible concept that depends on balancing numerous factors, including the particular control’s technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness”].) It also suggests a lack of understanding of two interrelated matters on which the Regional Board likely has expertise: the consequences of the measures included as permit conditions relative to any *777 alternatives and the interpretation of a complex federal statute governing regulation of the environment.
Second, beyond failing to consider all the relevant evidence bearing on the necessity of the imposed permit conditions, the Commission failed to extend any meaningful deference to the Regional Board’s conclusions—even though such deference was warranted given that the nature of the decisions involved in interpreting the CWA included evaluating appropriate alternatives and determining which of those were necessary to satisfy the federal standard. (See State Water Board, supra, 143 Cal.App.4th at p. 997 [“we defer to the regional board’s expertise in construing language which is not clearly defined in statutes involving pollutant discharge into storm drain sewer systems”]; City of Rancho Cucamonga v. Regional Water Quality Control Bd. (2006) 135 Cal.App.4th 1377, 1384 [38 Cal.Rptr.3d 450] (Rancho Cucamonga) [“consideration [should be] given to the [regional board’s] interpretations of its own statutes and regulations”]; Building Industry Assn., supra, 124 Cal.App.4th at pp. 879-880, fn. 9 [“we do consider and give due deference to the Water Boards’ statutory interpretations [of the CWA] in this case”]; see also Building Industry Assn. v. Bay Area Air Quality Management Dist. (2015) 62 Cal.4th 369, 389-390 [196 Cal.Rptr.3d 94, 362 P.3d 792] [explaining that “an agency’s expertise and technical knowledge, especially when it pertains to a complex technical statute, is relevant to the court’s assessment of the value of an agency interpretation”].) In the direct challenge to the permit at issue here, the local agencies argued that the Regional Board exceeded even those requirements associated with the maximum extent practicable standard, an argument the appellate court rejected in an unpublished section of its opinion. Because of its failure to afford any deference to the Regional Board or to conduct an analysis more consistent with the relevant standard of review, the Commission essentially forces the Board to defend its decision twice: once on direct challenge and a second time before the Commission.
Conditions as prosaic as trash receptacle requirements initially may not seem to implicate the Regional Board’s expertise. Yet its unique experience and technical competence matter even with respect to these conditions, because the use of such conditions implicates a decision not to use alternatives that might require greater conventional expert judgment to evaluate. Moreover, the Regional Board is likely to accumulate a distinct and greater degree of knowledge regarding issues such as the reactions of stakeholders to different requirements, and related factors relevant to determining which conditions are necessary to satisfy the CWA’s maximum extent practicable standard.
The Commission acknowledged that the State Water Resources Control Board—as well as the EPA—believed the permit requirements did not exceed *778 this federal standard. “The comments of the State Water Board and U.S. EPA,” the Commission noted, “assert that the permit conditions merely implement a federal mandate under the federal Clean Water Act and its regulations.” But the Commission afforded these conclusions no clear deference in determining whether the requirements were state mandates.
Nor is the majority correct in suggesting that the Commission had only a limited responsibility, if it had one at all, to extend any deference to the Regional Board. (See maj. opn., ante, at pp. 768-769.) The Regional Board’s judgment as to whether the imposed permit conditions were necessary to comply with federal law was a prerequisite to the Commission’s own task, which was to review the Board’s determination in light of all the relevant evidence. To the extent ambiguity exists as to whether the Regional Board’s conclusions incorporated any findings that these conditions were necessary to meet the federal standard (see id. at pp. 768-769), remand to clarify the Board’s position is in order. By instead simply upholding the Commission’s conclusion without remand, the majority displaces any meaningful role for the Regional Board’s expert judgment.
The majority does so even though courts have routinely emphasized the pivotal role regional boards play in interpreting the CWA’s intricate mandate. (See State Water Board, supra, 143 Cal.App.4th at p. 997; Rancho Cucamonga, supra, 135 Cal.App.4th at p. 1384.) And for good reason: If the Regional Board’s judgment is that the trash receptacle and inspection requirements are necessary to control pollutant discharges to the maximum extent practicable, such a conclusion is well within the purview of its expertise. Unsurprisingly, then, we have never concluded that the technical knowledge relevant to interpreting the requirements of the CWA—a statute that lacks a safe harbor and where discerning what phrases such as maximum extent practicable mean given existing conditions and technology is complex—lies beyond the ambit of the Regional Board’s expertise, or otherwise proves distinct from the sort of expertise that merits deference.
Third, the Commission devoted insufficient attention in its analysis to the role of states in implementing the CWA, and to how that role can be harmonized with the significant protections against unfunded mandates that the state Constitution provides. (See Cal. Const., art. XIII B, § 6, subd. (a).) By allowing states to assume such an important role in implementing its provisions, the CWA reflects principles of cooperative federalism. (See 33 U.S.C. §§ 1251(b), 1342(b); see also Boise Cascade Corp. v. EPA (9th Cir. 1991) 942 F.2d 1427, 1430 [“The federal-state relationship established by the [Clean Water] Act is . . . illustrated in Congress’ goal of encouraging states to ‘assume the major role in the operation of the NPDES program’ ”].) In accordance with the CWA’s express provisions, California chose to assume *779 the responsibility for implementation of the NPDES program in the state—a role that requires further specification of permitting conditions. (See 33 U.S.C. § 1342(c)(3) [states must administer permitting programs “in accordance with requirements of this section,” including compliance with the maximum extent practicable standard].) In the process, the state must comply with the constitutional protections against unfunded mandates requiring reimbursement of localities if permit conditions exceed what is necessary to comply with the relevant federal mandate. But given the nature of the relevant CWA provisions—and particularly the maximum extent practicable standard—it is wrong to assume that the conditions at issue in this case exceed what is necessary to comply with the CWA simply because neither the statute nor its regulations explicitly mention those conditions. The consequence of that assumption, moreover, risks discouraging the state from assuming cooperative federalism responsibilities—and may even encourage the state to withdraw from administering the NPDES. Indeed, counsel for the state indicated at oral argument that if the Commission’s reasoning were upheld—and the state were required to foot the bill for any conditions not expressly mentioned in the applicable federal statutes or regulations—it might think twice about entering into such arrangements of cooperative federalism.
In light of these concerns with the Commission’s approach to this case, it is difficult to see the basis for—or utility of—upholding the Commission’s decision, even under the inscrutable standard of review the majority employs. (See California Youth Authority v. State Personnel Bd. (2002) 104 Cal.App.4th 575, 586 [128 Cal.Rptr.2d 514] [substantial evidence review requires that all evidence be considered, including evidence that does not support the agency’s decision]; see also Sierra Club v. U.S. Army Corps of Engineers (2d Cir. 1983) 701 F.2d 1011, 1030 [“the court may properly be skeptical as to whether an [agency report’s] conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise”].) The better course, in my view, would be for us to articulate the appropriate standard for evaluating the question whether these permit conditions are state mandates and then remand for the Commission to apply it in the first instance.
II.
The Commission relied on a narrow approach that only compares the terms of a permit with the text of the CWA and its implementing regulations. Instead, the Commission should have employed a more flexible methodology in determining whether the permit conditions were federally mandated. Such a flexible approach accords with our prior case law. (See City of Sacramento, supra, 50 Cal.3d at p. 76 [whether local government appropriations are *780 federally mandated and therefore exempt from taxing and spending limitations under § 9, subd. (b), of art. XIII B of the Cal. Const, depends on, inter alia, the nature and purpose of the federal program, whether its design suggests an intent to coerce, when state or local participation began, and the legal and practical consequences of nonparticipation or withdrawal].) Moreover, it would have the added benefit of not discouraging the state from participating in ventures of cooperative federalism.
The majority may be correct that the facts of City of Sacramento are distinguishable. (See maj. opn., ante, at p. 768.) In that case, the state risked forsaking subsidies and tax credits for its resident businesses if it failed to comply with federal law requiring that unemployment insurance protection be extended to local government employees. {Id. at p. 764.) Here, in contrast, the negative consequences of failing to comply with federal law may seem less severe, at least in fiscal terms: the EPA may determine that the state is not in compliance with the CWA and reassert authority over permitting. (See 33 U.S.C. § 1342(c)(3).) But City of Sacramento nonetheless remains relevant, even though a precisely comparable level of coercion may not exist here. The flexible approach we articulated in that case remains the best way to ensure that some weight is given to the Regional Board’s technical expertise, and the conclusions resulting therefrom, while also taking account of the cooperative federalism arrangements built into the CWA.
So instead of adopting an approach foreign to our precedent, the Commission should have begun its analysis with the statutory and regulatory text—and then it should have considered other relevant materials and record evidence bearing on whether the permit conditions are necessary to satisfy federal law. Crucially, such evidence includes how the federal regulatory scheme operates in practice. The Commission could have examined, for instance, previous permits issued by the EPA in similarly situated jurisdictions, comparing them to the inspection and trash receptacle requirements the Regional Board imposed here and giving due consideration to the EPA’s conclusion that the maximum extent practicable standard is applied in a highly site-specific and flexible manner in order to account for unique local challenges and conditions. (See 64 Fed.Reg. 68722, 68754 (Dec. 8, 1999).) The Commission could also have considered whether, instead of identifying permitting conditions necessary to comply with the CWA, the state shifted onto local governments responsibility to conduct inspections or provide trash receptacles. The majority wisely notes that these are factors the Commission could have examined. (See maj. opn., ante, at pp. 770-772.) But the Commission mentioned this evidence only briefly, failing to grapple in any meaningful way with its implications for the issue at hand. We should allow the Commission an opportunity to do so in the first instance.
*781 The Commission should have also accorded appropriate deference to the Regional Board’s conclusions regarding how best to comply with the federal maximum extent practicable standard. One way to ensure that such deference is given would be to place on the party seeking reimbursement the burden of demonstrating that the challenged permit conditions clearly exceed the federal standard, or that they were otherwise unnecessary to reduce pollutant discharges to the maximum extent practicable. Doing so would make sense where the state is implementing a federal program that envisions routine state participation, the federal program does not itself define the minimum degree of compliance required, and the state’s implementing agency reasonably determines in its expertise that certain conditions are necessary to comply with the applicable federal standard.
* * *
The Commission’s decision—and the approach that produced it—fails to accord with existing law and with the nature of the applicable federal scheme. The state is not responsible for reimbursing localities for permit conditions that are necessary to comply with federal law, a circumstance that renders interpretation of the CWA central to this case. A core principle of the CWA is to facilitate cooperative federalism, by allowing states to take on a critical responsibility in exchange for compliance with a set of demanding standards overseen by a federal agency capable of withdrawing approval for noncompliance. (See Arkansas v. Oklahoma (1992) 503 U.S. 91, 101 [117 L.Ed.2d 239, 112 S.Ct. 1046] [“The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: ‘to restore and maintain the chemical, physical, and biological integrity of the Nation’s waters’ ”]; Shell Oil Co. v. Train (9th Cir. 1978) 585 F2d 408, 409 [“Shell’s complaint must be read against the background of the cooperative federal-state scheme for the control of water pollution”].) The Commission failed to interpret the statute in light of nuances in its text and structure. And it failed to offer even a modicum of deference to the Regional Board’s interpretation, despite the Board’s clear expertise that the technical nature of the questions necessary to interpret the scope of the CWA demands.
Accordingly, I would remand the matter to the Court of Appeal with directions that it instruct the Commission to reconsider its decision. On reconsideration, the Commission should appropriately defer to the Regional Board, consider all relevant evidence bearing on the question at hand, and ensure the evidence clearly shows the challenged permit conditions were not necessary to comply with the federal mandate. This is the standard that most *782 thoroughly reflects our existing law and the nature of the CWA. Any dilution of it exacerbates the risk of undermining the nuanced federal-state arrangement at the heart of the CWA.
Liu, J., and Kruger, J., concurred.
The petition of plaintiffs and respondents for a rehearing was denied November 16, 2017, and the opinion was modified to read as printed above. Cuéllar, J., was of the opinion that the petition should be granted.