Filed 12/5/24  Sicking v. City of Upland CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| LOIS SICKING, | |
| Plaintiff and Appellant, | E082066 |
| v. | (Super.Ct.No. CIVSB2118832) |
| CITY OF UPLAND, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Donald R. Alvarez, Judge.  Affirmed.

Briggs Law Corporation, Cory J. Briggs, and Janna M. Ferraro for Plaintiff and Appellant.

Best Best & Krieger and Amy E. Hoyt for Defendant and Respondent.

The City of Upland (the City) applied for a grant from the California Department of Parks and Recreation (the Department) to renovate and revitalize a local park.  The application process required the City to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq., CEQA).  (Unlabeled statutory

1

references are to the Public Resources Code.)  The City accordingly assessed the possible significant environmental impacts of the proposed renovations and upgrades and issued a mitigated negative declaration, signifying its determination that even though the renovations could have a significant environmental effect there would be none because the project was modified by measures to mitigate those environmental effects.

Lois Sicking, a resident of the City, filed a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) in the superior court, challenging the proposed renovations on the ground that CEQA required the City to prepare an environmental impact report.  The trial court denied the petition and upheld the City's adoption of the mitigated negative declaration.

On appeal, Sicking contends that (1) the project's description in the mitigated negative declaration violates CEQA because it is not accurate, finite, or stable, and (2) the City was required to prepare an environmental impact report because there is substantial evidence of a fair argument that the proposed project may have a significant environmental impact on the park's trees and various bird species that inhabit and nest in those trees.  We reject the contentions and affirm.

CEQA OVERVIEW

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment" and is "to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'"  (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)  The Legislature enacted CEQA "to (1) inform the government and public about a proposed activity's potential

2

environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*CBIA*).)

To achieve those goals, CEQA and its implementing regulations require public agencies to comply with a three-step process when planning an activity that might come within CEQA's scope. (*CBIA*, *supra*, 62 Cal.4th at p. 382; *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286 (*Tomlinson*); Cal. Code Regs., tit. 14, § 15000 et seq. (hereinafter CEQA Guidelines[1]).) At "the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency." (*Tomlinson*, at p. 286; § 21065; CEQA Guidelines, § 15378(a).) If the proposed activity is a project, then the second step applies. (*Tomlinson*, at p. 286.) Under the second step, the public agency must "decide whether it is exempt from

---

[1] "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' (CEQA Guidelines, § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2.)

3

compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300)." (*Ibid.*) "If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.'" (*Ibid.*) If the agency determines that the project has potentially significant effects on the environment but also determines that (1) those effects can be mitigated "to a point where clearly no significant effect on the environment would occur" and (2) "there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment," then the agency may adopt a "'mitigated negative declaration'" instead of preparing an environmental impact report. (§ 21064.5; CEQA Guidelines, § 15070(b).) If the agency determines that the project may have a significant impact on the environment regardless of mitigation measures, then the agency must proceed to the third step, "which entails preparation of an environmental impact report before approval of the project." (*Tomlinson*, at p. 286; *Upland Community First v. City of Upland* (2024) 105 Cal.App.5th 1, 13 (*Upland Community*).)

BACKGROUND

I. *Proposition 68*

In June 2018, California voters approved Proposition 68, the California Drought, Water, Parks, Climate, Coastal Protection, and Outside Access for All Act of 2018 (the Act), which implemented Senate Bill No. 5 (2017-2018 Reg. Sess.). (Stats. 2017, ch. 852; 2018 Cal. Legis. Serv. Prop. 68 (Proposition 68).) The Act added section 80050 to

4

the Public Resources Code, which made $700 million available to the Department "upon appropriation by the Legislature, for the creation and expansion of safe neighborhood parks in park-poor neighborhoods in accordance with" other legislation. (§§ 80002, subd. (d), 80050, subd. (a).) The funds were made available through a competitive grants program in which applications were accepted in multiple rounds.

II.      *The City's grant application*

In 2019, the City submitted an application to the Department for $8.5 million to fund the renovation and revitalization of Upland Memorial Park (the park). The Inland Oversight Committee filed a lawsuit challenging the City's use of a categorical exemption under CEQA for the proposed improvements to the park. The City and the Inland Oversight Committee settled the lawsuit. The City agreed to "prepare an initial study under CEQA for a possible Master Plan of improvements for Memorial Park," but the City did not agree to "pre-commit to any level of CEQA review beyond the initial study."

In 2021, the Upland city council (the city council) approved a resolution for the City to re-apply for $8.5 million to fund the renovation and revitalization of the park. As part of that resolution, the City recognized that successful grant applicants would "enter into a contract with the State of California to complete the Grant Scope project." In March 2021, the City resubmitted its application to the Department for the revitalization project for the park. Within 90 days of the filing of the application, the City had to comply with CEQA to determine whether any significant environmental impacts would result from the project. In conjunction with the application, the city manager certified

5

that the City would comply with CEQA and that the project would be "described in adequate and sufficient detail to allow the project's construction or acquisition."  The city manager further certified that the CEQA analysis would "encompass[] all aspects of the work to be completed with grant funds."

In a June 2021 report from the city manager to the city council, the city manager recommended that the city council adopt a resolution approving the Upland Memorial Park Revitalization Master Plan (the master plan) and the Mitigated Negative Declaration and associated Mitigated Monitoring Program.

III.    *The initial study and the mitigated negative declaration*

In June 2021, after providing notice, receiving comments, and holding a public hearing, the city council approved the master plan and adopted the mitigated negative declaration.  The city council concluded that the proposed renovations and upgrades to the park as mitigated by specified measures would not have a significant impact on the environment.

Section 2 of the mitigated negative declaration is entitled "Project Description" and consists of four pages plus attached exhibits, including a site plan and a site legend. Section 2 describes the park as a 40-acre developed public park with various onsite structures and amenities, including a YMCA building, a community center, and the City's animal shelter.  The park contains three lighted ballfields, one lighted basketball court, a skate park, a bandshell, playground equipment, picnic areas, and designated areas to park.  The park contains a rose garden and is landscaped with ground cover and various types of tree species, including oak trees.

In a subsection of section 2 entitled "Proposed Upgrades and Improvements," the mitigated negative declaration explains that the City "is proposing to mainly upgrade and rehabilitate existing facilities throughout the park, although some new facilities will be added to meet current community recreational needs." (Underlining omitted.) The location of each of the proposed improvements and upgrades is shown on an attached site plan with an accompanying legend identifying the location of each proposed improvement and upgrade. The proposed renovations and improvements are also "generally described" in a list of 22 items.

Thirteen of the 22 items are classified as "new." One project involves construction of a new tiny tots building after destruction of the preexisting facility. According to the site legend, the new building will be located in the same place as its predecessor. The remaining 12 new additions include: a children's adventure playground, a central greenbelt and outdoor amphitheater, a splash pad water play area, an open turf grass play area, a drought tolerant native plant garden, a bioswale and bioretention zones for stormwater collection, shade structures and picnic tables near the community center, a two-mile decomposed granite exercise trail system, an outdoor fitness gym, two parking areas, LED lighting, and security cameras.

The remaining nine listed items are improvements to existing facilities. They include: adding a gazebo to the rose garden, renovating a picnic area by adding seating and games, refurbishing existing trash receptacles and adding more, upgrading the skate park, expanding an existing building to be a multiuse recreational facility, modernizing existing bathroom facilities to comply with the Americans with Disabilities Act of 1990

7

(42 U.S.C. § 12101 et seq.), upgrading an existing ballfield, and restoring a bridle path and a play area.

Several of the descriptions of the 22 proposed upgrades and improvements mention the park's existing trees. The descriptions of upgrades to an existing ballfield, "the oak-lined 'bridle path,'" and a play area mention that existing trees, including "existing oak trees," will be preserved. The site legend for construction of the new tiny tots building also indicates that existing trees will be preserved. The planned bridle path restoration also includes the planting of new oak trees.

Section 3 of the mitigated negative declaration is nearly 50 pages long and contains an analysis of all of the possible environmental impacts that were assessed. As to whether the project will cause the "loss of forest land or conversion of forest land to non-forest use," the mitigated negative declaration concludes that the impact would be less than significant. In explaining that finding, the mitigated negative declaration describes the park as containing "a large number of existing oak trees" and states that the City's goal is "to retain as many of the existing oak trees on the Project site as possible."

The initial study found that the project would result in a significant environmental impact because of the loss of active nests for common and special-status birds, resulting in the possible loss of those nesting birds' eggs or young offspring. That determination was based on a biological resources assessment (the biological assessment) that was prepared by MIG, Inc. (MIG) to determine "the type, location, and extent of potential sensitive biological resources within the [park] and vicinity." The biological assessment asserted that certain native and ornamental trees at the park "have the potential to provide

8

nesting habitat for bird species protected by [Fish and Game Code sections] 3503 and 3513.  There is potential for ground and tree-nesting birds to establish nests on the Project site prior [to] any project-related construction.  Construction activities including site mobilization, limited tree removal, other vegetation clearing, grubbing, grading, and noise and vibration from the operation of heavy equipment have the potential to result in significant direct (i.e., death or physical harm) and/or indirect (i.e., nest abandonment) impacts to nesting birds.  The loss of an active nest of common or special-status bird species and/or their eggs or young as a result of Project construction will be considered a violation of the [Fish and Game Code] Section[s] 3503, 3503.5, 3513 and therefore, will be considered a potentially significant impact."

The City determined that with mitigation measures the project would have a less than significant impact on the nesting habitat of certain bird species.  The mitigation measures approved in the mitigated negative declaration include:  A qualified biologist with specified credentials will conduct a focused survey for active nests no more than five days before the beginning of specified project-related activities that would result in vegetation removal, if that removal occurs during nesting season (February 1 through September 1).  Any time project-related work is paused for at least five days, an additional nest survey will be conducted before work resumes.  If any nests are encountered during the preconstruction survey, a qualified biologist will determine the feasibility of construction continuing as planned without impacting the nests' success.  Any nest at the project site will be monitored by a qualified biologist during active construction if the construction is adjacent to a predetermined buffer zone in which work

9

is not allowed. If the qualified biologist determines that construction activities might adversely affect a nest, then the qualified biologist will direct the construction manager to immediately stop construction activities within a specified distance from the nest, dependent on the species of the nesting bird. Construction activities will be allowed to resume only when a qualified biologist determines that "the nest is no longer active due to natural causes (e.g., young have fledged, predation, or another non-human related nest failure)." The mitigated negative declaration identifies the precise location where those surveys are to occur in relation to the project activity and with consideration of particular types of bird species.

IV.  *Present litigation*

In September 2021, Sicking filed a verified amended petition for writ of mandate, alleging that the City violated CEQA by failing to prepare an environmental impact report for the project. She further alleged that the project description in the mitigated negative declaration violated CEQA because it is "not precise, concrete, and/or stable." In a later-filed brief, Sicking argued that the description of the project was "not accurate, stable, or finite" and that substantial evidence supported a fair argument that the project would have a significant environmental impact "on certain biological resources at the Park—namely, the 'heritage' oaks, sycamores, and other trees and certain endangered or threatened birds and raptors." In opposition, the City argued that (1) the master plan did not qualify as a project, (2) if it did, the description of the project complied with CEQA, and (3) there is no substantial evidence that the project may have a significant impact on biological resources, so an environmental impact report is not required.

The trial court denied the petition, concluding that (1) the master plan is a project under CEQA, (2) the mitigated negative declaration's description of the project is "accurate, stable, and finite," and (3) the administrative record does not contain substantial evidence to support a fair argument that the project may have a significant environmental impact despite the mitigation measures.

STANDARD OF REVIEW

"Appellate review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision." (*Lucas v. City of Pomona* (2023) 92 Cal.App.5th 508, 537.) We review the agency's compliance with CEQA for "prejudicial abuse of discretion," which "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171.)

DISCUSSION

Sicking contends that the mitigated negative declaration violates CEQA because it is not accurate, stable, and finite. She also argues that the City violated CEQA by failing to prepare an environmental impact report, because the administrative record contains substantial evidence supporting a fair argument that the project may have significant environmental impacts on the park's trees and its bird population. We are not persuaded.

Sicking also contends that the master plan qualifies as a project under CEQA. For purposes of this appeal, we assume that is correct.

11

I.    *Project description*

Sicking contends that the mitigated negative declaration violated CEQA by failing to provide an accurate, stable, and finite description of the project.  The contention lacks merit.

A mitigated negative declaration must include "[a] brief description of the project, including a commonly used name for the project, if any," and the project's location. (CEQA Guidelines, § 15071(a)-(b).)  "An accurate and complete project description is necessary to fully evaluate the project's potential environmental effects."  (*El Dorado County Taxpayers for Quality Growth v. County of El Dorado* (2004) 122 Cal.App.4th 1591, 1597; *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 406.)  The description must be "'accurate, stable, and finite'" (*Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 990; *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 85 (*McCann*)), but it need not "'"supply extensive detail beyond that needed for evaluation and review of the environment impact"'"" (*McCann*, at p. 85; CEQA Guidelines, § 15124).  "When an agency fails to provide an accurate project description, the environmental review process is tainted by that informational defect and the adoption of a negative declaration in those circumstances is inappropriate."  (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 402.) Whether a project's description is accurate presents a question of law that we independently review.  (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332; *Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 673 (*Save Our Capitol!*); *Planning &*

12

*Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 958.)

Sicking contends that the project description is not accurate, stable, and finite for numerous reasons. None of the contentions is meritorious.

Sicking first argues that the project description is misleading, because the mitigated negative declaration states generally that the City's proposal is "to *mainly* upgrade and rehabilitate existing facilities throughout the park." (Italics added.) Sicking contends that the adverb "mainly" renders the description misleading, because more than half of the 22 listed upgrades "are described as 'new' features and not renovations or upgrades of existing features or facilities."

We are not persuaded. Parts of the project can be accurately described as both "new" and "upgrades." For example, the master plan calls for the destruction of the existing tiny tots building and the construction of a new tiny tots building in its place. That is both new construction and an upgrade on the old building, by demolishing it and replacing it with something better. Similarly, various items call for the construction of new parking areas, which constitutes an upgrade of the existing parking facilities. The prefatory general claim that the project consists "mainly" of upgrades and rehabilitations would not mislead a reasonable reader to believe that more than half of the 22 listed items cannot possibly contain anything that could fairly be described as "new." Sicking's argument thus fails to show that the master plan's use of the word "mainly" is misleading or otherwise renders the description of the project inaccurate.

Sicking's second argument is that the project description is inaccurate because the mitigated negative declaration does not state that the "'primary purpose'" of the CEQA review undertaken by the City was "for grant-application purposes only." The argument lacks merit. The City's CEQA review of course had multiple purposes: to comply with the settlement of the prior litigation, to comply with CEQA, to apply for grant funds, and to facilitate construction of the project. Sicking does not identify any statute or regulation requiring the mitigated negative declaration to state the "'primary purpose'" of the CEQA review, let alone how such a "'primary purpose'" is to be determined. Rather, CEQA just requires that a mitigated negative declaration include "[a] brief description of the project" along with the project's name and location. (CEQA Guidelines, § 15071(a)-(b).) We will not rewrite the statute or its implementing regulations to include a requirement that does not appear in the statutory or regulatory language.[2] (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 807.)

Sicking's third argument challenging the project's description fares no better. She contends that the itemized "list of proposed improvements with only 'general

---

[2] Sicking also argues that "if the true (albeit undocumented) purpose of the Project was for seeking grant funds, the Project's indefinite and unstable description appears to contravene the City's own CEQA Compliance Certification in its Prop 68 grant application." (Bold and italics omitted.) The City contends that Sicking failed to exhaust her administrative remedies with respect to that claim because Sicking did not raise the exact issue with the City. (§ 21177, subd. (a); *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535-536.) Sicking contends that she did not have an opportunity to raise the issue with the City, so it was not capable of being exhausted. (§ 21177, subd. (e).) We need not address the issue, because the mitigated negative declaration's project description is not rendered inaccurate by the failure to state that one of the reasons the CEQA review process was undertaken was to apply for a grant.

14

descriptions'" is insufficiently detailed. But as previously noted, the description need not ""'"supply extensive detail beyond that needed for evaluation and review of the environment impact."'"" (*McCann*, *supra*, 70 Cal.App.5th at p. 85; CEQA Guidelines, § 15124). The only authority that Sicking cites for the proposition that the 22 itemized descriptions are insufficiently detailed is *Save Our Capitol!*, *supra*, 87 Cal.App.5th at page 674. But the issue in that case was "how much may a project develop or change after the draft [environmental impact report] is circulated before the project description is no longer accurate, stable, and finite." (*Ibid.*) The case does not support Sicking's argument that the project description is insufficiently detailed. Thus, as the superior court observed, Sicking "does not cite any legal authority that requires design details, and courts have rejected such arguments. (See [*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 35].)"

Sicking's last argument concerning the project description is also unavailing. She contends that the project description is "unstable and potentially incomplete" because section 3 of the mitigated negative declaration—the section evaluating the project's possible environment impacts—shows that the upgrades and improvements listed in section 2 are "not exhaustive." (Bold and italics omitted.) Her contention is based on the use of the phrase "but not limited to" in various passages in section 3.

The argument is meritless because the phrase "but not limited to" is used in section 3 in sentences that give examples of components of the project rather than exhaustively describing all 22 items. The phrase thus indicates only that those sentences do not expressly refer to all 22 items; it does not indicate that the project is not limited to

15

those 22 items. For example, in explaining why the project will not have a significant impact on the scenic vista, section 3 contains the following passage: "The Project proposes improvements to the existing onsite recreational amenities and buildings/structures as well as to reconfigure the existing parking lot. In addition, the Project proposes additional buildings/structures and recreational amenities such as *but not limited to*, an amphitheater, a tiny tots building, new playground equipment, play fields, recreational courts/fields and picnic seating areas." (Italics added.) The use of the phrase "such as" before "but not limited to" means that the sentence is giving some examples rather than presenting an exhaustive list of all 22 items (or of all of the project's "additional buildings/structures and recreational amenities" among those 22 items). (See *Jon Davler, Inc. v. Arch Ins. Co.* (2014) 229 Cal.App.4th 1025, 1040 [an average person understands "that 'such as' means that examples follow"].) The inclusion of the phrase "but not limited to" thus means that there may be more examples among the previously listed 22 items. It does not mean that the project is not limited to those 22 items.

For the foregoing reasons, we conclude that Sicking has failed to establish that the project's description in the mitigated negative declaration is legally inadequate under CEQA. Because we conclude that the project description complies with CEQA and is accurate, stable, and finite, we also reject Sicking's argument that the project description's purported inadequacies deprived the public of a meaningful opportunity to evaluate the project.

16

II.     *Substantial evidence*

Sicking contends that the record contains substantial evidence supporting a fair argument that the project "could have a potentially significant impact on the Park's tree inventory, including so-called 'heritage' trees, and the bird species that call those trees home," so the City violated CEQA by not preparing an environmental impact report.  We disagree.

A.     *Legal framework*

An agency must prepare an environmental impact report "'whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment."''"  (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 722; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1123, 1134-1135.)  The fair argument standard is "derived from an interpretation of the language of, and policies underlying, section 21151 itself" and only applies to the decision to prepare an environmental impact report or a negative declaration.  (*Laurel Heights*, at p. 1135; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [adoption of fair argument standard]; §§ 21151, subd. (a), 21080, subd. (b) [exceptions], 21082.2, subd. (a) [fair argument standard]; CEQA Guidelines, § 15064(f)(1).)  "'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment."  (§ 21068; *Laurel Heights*, at p. 1123.)  "'"May" means a reasonable possibility.'"  (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 191.)  The fair argument standard creates a "low threshold" for an agency to prepare an environmental impact report, thus

17

"'afford[ing] the fullest possible protection to the environment within the reasonable scope of the statutory language.'" (*No Oil*, at p. 84.)

If an agency is presented with substantial evidence supporting a fair argument that a project may have a significant effect on the environment, then the agency is required to prepare an environmental impact report "even though it may also be presented with other substantial evidence that the project will not have a significant effect." (CEQA Guidelines, § 15064(f)(1).) CEQA defines "substantial evidence" to include "fact[s], a reasonable assumption predicated upon fact[s], or expert opinion supported by fact[s]." (§ 21080, subd. (e)(1).) "Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (*Id.*, subd. (e)(2); *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 690 (*Joshua Tree*); *Upland Community*, *supra*, 105 Cal.App.5th at p. 13.)

In reviewing the City's decision to adopt a mitigated negative declaration under CEQA's prejudicial abuse of discretion standard of review (§ 21168.5), we independently review the entire administrative record to determine whether it contains substantial evidence supporting a "'fair argument'" that the project, as revised, will have a significant impact on the environment. (*Joshua Tree*, *supra*, 1 Cal.App.5th at p. 684; *McCann*, *supra*, 70 Cal.App.5th at p. 87.) As the appellant, Sicking bears "the burden of identifying substantial evidence in the administrative record to support a fair argument that the projects may have a significant impact that is not mitigated." (*McCann*, at p. 87.)

18

We afford no deference to the agency's determination concerning whether there is substantial evidence supporting a fair argument that the project may have a significant environmental impact. (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1331.)

"The sufficiency of the evidence to support a fair argument presents a question of law." (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1109.) When the administrative record contains "substantial evidence supporting a fair argument that the project will significantly impact the environment, an agency abuses its discretion in failing to require an [environmental impact report]." (*Ibid.*)

B.   *Birds*

Sicking argues that there was substantial evidence in the administrative record to support a fair argument that the project could have a potentially significant impact on the birds who inhabit and nest in the trees in the park. We disagree.

To support her argument, Sicking relies on a survey commissioned by the People for Upland Parks and conducted by Daniel Cooper, who has a Ph.D. in biology and is the president of Cooper Ecological Monitoring, Inc., an ecological consulting firm specializing in wildlife and biodiversity issues. The People for Upland Parks submitted the survey to the City during the public comment period. Cooper reviewed various sources that documented birds that others sighted at the park, the site plan from the mitigated negative declaration, and the description of the natural setting, site, wildlife, and plants from the biological assessment.

19

In addition to reviewing those materials, Cooper and another biologist conducted a field survey of the park one morning in June 2021 in which they observed 18 species of birds and two native mammals. Of significance, they observed an active Cooper's Hawk nest (which Cooper identifies as a "special-status species"), a pair of American Kestrels who were "likely nesting" at the park and are considered "a sensitive species" in several states, and two bird species on the United States Fish and Wildlife Service's list of "'Bird Species of Concern'"—an Allen's Hummingbird and an Oak Titmouse. Cooper found it concerning that in conducting its biological assessment MIG did not note the presence of either Cooper's Hawks or American Kestrels in the park. Cooper noted that American Kestrels are not formally designated as a special-status species, but the species "is nearly extirpated as a nester from the Los Angeles Basin, so its presence at Memorial Park is significant, as it is clearly finding some important resource/nesting structure here to allow it to persist."

Cooper recommended that "no further development occur at Memorial Park that would remove oaks and sycamores, or that would occupy existing parkland with hardscape." Because of "the rarity of nesting kestrels, [Cooper] would not replace the light fixtures in the baseball diamond area (or if they are to be replaced, I would install at least one kestrel nesting box in the area)."

Cooper's report does not constitute substantial evidence supporting a fair argument that the project may have a significant impact on any species of bird that is not otherwise mitigated. (*McCann*, *supra*, 70 Cal.App.5th at p. 87; § 21064.5.) According to the mitigated negative declaration, impacts to migratory and nesting bird species will be

20

mitigated to a less than significant level with the adoption of specified mitigation measures aimed at discovering and protecting any nesting birds during nesting season. Cooper does not explain why or how those measures would not be sufficient to protect the nests of Cooper's Hawks, American Kestrels, or any other bird species discovered during the qualified biologist's survey for nests, which the mitigated negative declaration requires be conducted within five days of the start of any construction. The mitigation measures apply to all birds' nests found before or during construction activity. Nothing in Cooper's survey indicates that the project may still significantly impact nesting birds or birds in general despite those mitigation measures. Moreover, although Cooper makes certain recommendations in his report concerning lighting at a ballfield, the removal of trees, and the installation of nesting boxes, he does not state that the project may have a significant environmental impact if the recommendations are not adopted.

We accordingly conclude that Sicking has failed to carry her burden of identifying substantial evidence in the record supporting a fair argument that the project may have a significant environmental impact on birds that is not mitigated. (*McCann*, *supra*, 70 Cal.App.5th at p. 87.)

C.    *Trees*

Sicking also has not identified any substantial evidence in the administrative record to support a fair argument that the project may have a significant environmental impact on "the 'heritage' oaks, sycamores, and other trees." Sicking's arguments concerning the possible impact on the park's tree inventory rely entirely on comments made by members of the public, including herself. One resident accused the City of

21

"ignoring the global climate catastrophe" and failing to recognize "the treasure that pocket of green trees and grass [at the park] provide us, (sucking up carbon from the atmosphere and giving us clean air to breathe, not to mention providing a small space for wildlife and birds)." (Some capitalization omitted.) Another former resident speculated that placement of the splash pad would result in "removal of many of the parks [*sic*] biggest and oldest oaks." People for Upland Parks likewise noted: "Placing the project plans over the aerial photo of the project site clearly shows that many mature trees, including many invaluable mature oaks and sycamores that provide consistent nesting sites for native birds, will be permanently removed."

Sicking asked for a copy of the park's current tree inventory and questioned, "How many trees, type, and dimensions of the trees that are proposed to be removed?" The City's contract planning manager told the MIG consultant that the City did not have any such inventory.

The comments both individually and cumulatively do not constitute substantial evidence supporting a fair argument that the project may have a significant environmental impact on the park's trees. The comments amount to nothing more than speculation that the project may result in some trees being removed and the opinion that such removal will contribute to climate change. First, the commentors' speculation aside, there is no evidence about how many, if any, trees will be removed from the park. On the contrary, the mitigated negative declaration repeatedly states that its goal is to maintain and preserve as many existing trees, including "existing oak trees," as possible. Second, Sicking's argument notwithstanding, the possible environmental impact of the removal of

22

any trees from the park is a matter of technical expertise involving such scientific fields as biology and climatology. Although laypersons may provide opinion evidence on issues that do not require special expertise, testimony by nonexpert members of the public concerning technical or scientific information "'does not qualify as substantial evidence.'" (*Joshua Tree*, *supra*, 1 Cal.App.5th at pp. 690-691.) The public comments of nonexpert laypersons about the possible environmental impacts of removing any trees from the park do not constitute substantial evidence. Moreover, "'[c]omplaints, fears, and suspicions about a project's potential environmental impact likewise do not constitute substantial evidence.'" (*Id.* at p. 690; *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 636 ["'"'dire predictions by nonexperts *regarding the consequences of a project* do not constitute substantial evidence'"'"].)

With respect to the City's admission that it does not have an inventory of the park's trees, Sicking argues that "[t]he City should not be allowed to hide behind its own failure to gather relevant data about the very large and very old trees in the Park that would be impacted by the Project, particularly given that the City's municipal code requires such a register to exist."[3] Sicking does not explain how the absence of such an

---

[3]     Upland Municipal Code section 12.26.040 provides: "The city is committed to promoting the health, safety and welfare of present and future residents of the city by providing for the identification and preservation of landmark and historical trees existing within the city. Heritage and landmark trees are trees which by the nature of their physical, social or environmental significance or contribution to the identity of neighborhoods, merit community recognition and protection. Identification of these trees shall further be defined as having a species rarity, an association with historical events or

*[footnote continued on next page]*

inventory amounts to substantial evidence supporting a fair argument that the project may have a significant environmental impact on trees. Nor does she explain how the existence of such an inventory would have affected the analysis of the environmental impact, given that the administrative record does not contain any *evidence* concerning the possible environmental impact of the loss of any trees.[4]

For the foregoing reasons, we conclude that Sicking has failed to carry her burden of identifying substantial evidence in the administrative record supporting a fair argument that the project may have a significant environmental impact on trees that is not mitigated.[5] (*McCann*, *supra*, 70 Cal.App.5th at p. 87.)

---

persons, a scenic enhancement or a remarkable abnormality. The committee shall have the location, and identification of all trees, including any trees which qualify as landmark or heritage trees. An official register of heritage and landmark trees shall be developed and maintained by the city. The register shall contain information specifying the location, size, and species and shall identify findings in the street tree inventory for each resource designation."

[4]     It is true that a negative declaration or a mitigated negative declaration is not appropriate if an agency "'fails to gather information and undertake an adequate environmental analysis in its initial study.'" (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1202.) However, Sicking does not argue that the City's lack of a tree inventory itself violated CEQA.

[5]     Throughout her opening brief, Sicking asserts that the City did not publicly disclose the response to the public comments prepared by MIG before the city council approved the mitigated negative declaration. The assertion is not supported by any legal argument or analysis explaining how such a purported failure violated CEQA, if at all. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [appellate court not obliged to develop an appellant's argument or to speculate about the issues counsel intended to raise].) To the extent that Sicking is attempting to make an argument, we consider it forfeited. (*Ibid.* [appellate court may "'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he [or she] wants us to adopt'"].)

## DISPOSITION

The judgment is affirmed.  The City shall recover its costs of appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.