Filed 4/28/25 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF SAN DIEGO, <br><br> Defendant and Respondent. | D083555 <br><br> (Super. Ct. No. 37-2022-00044215-CU-WM-CTL) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br><br> NO CHANGE IN JUDGMENT |


THE COURT:

It is ordered that the opinion filed on March 27, 2025 be modified as follows:

1. On page 6, after section C. of the Factual and Procedural Background and before the paragraph beginning "By resolution in September 2022," insert the following paragraph:

> San Diego County encompasses more than 4,200 square miles in the southwest corner of the state. Not surprisingly, its population of more than 3 million is concentrated on the western side of the County nearer the coast, which is where the incorporated cities—including most of the employment centers, commercial areas, and attractions—are located. The unincorporated portions of the County generally extend east from the County center. Because of their location, residential developments in the unincorporated areas of the County typically generate per

capita VMT higher than the County average because residents in these areas regularly travel to the incorporated portions nearer the coast for activities like jobs, shopping, and recreation.[fn. 5]  (See Appendix B.)

2. In addition to the item 1 above, add new footnote 5 at the end of the fourth sentence with the following language, which will require renumbering of all subsequent footnotes:

    5  County figures reflect a per capita VMT for the entire County—which includes both the incorporated and unincorporated areas—of 21.85.  By contrast, the per capita VMT for the County's unincorporated areas—generally in the central and eastern portions of the County—was 32.54.

3. On page 7 at the end of the last paragraph, after the words "match that of the village," insert the following citation:

    (See Appendix A.)

4. The first sentence at the top of page 8 beginning "Neither the County" is modified to read:

    Neither the County nor the infill consultant relied on any VMT-related analysis, by way of sampling or otherwise, to identify the areas that would fall under this threshold.

5. On page 8, the second paragraph commencing with "The record on appeal" and ending at the top of page 9 is modified to read:

    The record on appeal contains a smattering of information concerning the VMT in the County.  For purposes of measuring VMT impacts, the county-wide data was used as the comparison.  (See Appendix B.)  Using 21.85 as the per capita VMT for the County, projects requiring this type of VMT analysis can have a per capita VMT no higher than 18.57 to meet OPR's 15 percent standard.  According to our review of the maps provided by the infill consultant and the County, the infill locations and associated villages generally had per capita VMT values higher than the County average (and much

higher than OPR's 15 percent standard). (Compare Appendix A with Appendix B.)

6. On page 9, second sentence of the bottom paragraph beginning "It also maintained" is modified to read:

> It also maintained that substantial evidence supported the adoption of the infill threshold because it was based on quantitative data—i.e., household and intersection density and job availability—and what the County claims is the generally accepted assumption that development projects in denser areas, such as infill, do not significantly impact VMT.

7. The first full paragraph on page 14 beginning "In the context of this case" is modified to read:

> In the context of this case, the County was required to make some showing that development consistent with the adopted infill threshold will normally or likely result in an insignificant transportation effect.[fn.] In other words, will development in infill and village areas, as defined by the County, *generally* result in per capita VMT that is insignificant, even if it does not *always* do so? (See Guidelines, § 15064.7, subd. (a) [a threshold of significance predicts when the effect "will normally be determined to be significant"].) In framing the requirement in this manner, we have rejected plaintiffs' assertion that any threshold must meet OPR's 15 percent standard, as the Technical Advisory proposes three transportation significance thresholds that lack any specific VMT targets. (See *ante*, at p. 6.) At the same time, the County cannot simply assume that infill development projects will generate per capita VMT below the county average when all the evidence is to the contrary.

8. On page 15, the last sentence of the bottom paragraph beginning "The infill consultant" and ending on the top of page 16 is modified to read:

3

The infill consultant, who provided the maps we referenced earlier (see *ante*, at pp. 8–9) and was aware of Senate Bill 743's emphasis on infill development, stated that defining appropriate screening criteria "would require evidence to support the determination that projects in these locations would have a less than significant transportation impact and meet the intent of [Senate Bill] 743."

9. The second full sentence at the top of page 16 that begins "Both consultants' comments" will become a new paragraph after the words "the regional mean" and modified to read:

Both consultants' comments are consistent with our review of the maps in the record. As we have noted, the unincorporated areas generally extend east from the central sections of the County. Due to the concentration of population and development near the Pacific Ocean, even infill development in the westernmost unincorporated areas of the County will likely generate per capita VMT in excess of the County average based on the assumption that residents of a new development will exhibit transportation habits similar to their neighbors in existing developments.[fn. 12] (See *ante*, at p. 7.) In other words, rather than showing that infill development as defined by the County will normally or generally result in transportation effects that are VMT-insignificant, the County's evidence indicates just the opposite. (See Appendices A and B.)

10. In addition to the item 9 above, add new footnote 12 at the end of the third sentence with the following language, which will require renumbering of all subsequent footnotes:

12 The County made no attempt to show otherwise, instead assuming that at some undefined point in the future, infill development will drive changes to travel patterns that could reduce per capita VMT. By way of comparison, the OPR recommendation of a screening threshold for affordable housing projects built in infill locations cites to evidence indicating that residents of such projects have per capita VMT significantly less than their

4

neighbors in market rate housing.  (Technical Advisory, *supra*, at pp. 14–15.)

11.     The last sentence on the bottom of page 16 beginning "Although that characterization," including the two full sentences at the top of page 17 that ends "is not helpful to the County's case," will become a new paragraph and modified to read as follows:

Although that characterization is generally true, the equations to which the County points are valid only for an urban or suburban "project that is designed with a higher density of dwelling units compared to the average density in the U.S." or that "is designed with a higher density of jobs compared to the average job density in the U.S." Notably, the Transportation Guide does not support the infill threshold with information provided in the CAPCOA Handbook; in fact, it expressly exempts infill development from the handbook's VMT-related methodologies. Moreover, the CAPCOA Handbook neither defines infill nor describes density in a way that is analogous to how the County identified infill locations.  Thus, the CAPCOA Handbook is not helpful to the County's case.

12.     The first full paragraph on page 17 beginning "The evidence that the County's infill consultant" is modified to read:

The evidence that the County's infill consultant warned "would [be] require[d]" is precisely what is missing here. Such evidence is absolutely necessary to support a conclusion that projects in defined infill locations would generally "have a less than significant transportation impact" in terms of VMT.  It is not enough to say that infill development is better than non-infill development in terms of transportation impact or that increasing development density is generally a good thing.  Infill development can have positive benefits and still create significant transportation effects that must be considered. The question is not a relative one, but rather one of significance versus insignificance as to the specific infill and village areas the County has identified where projects may be developed without the need for studying VMT impacts.  The County has failed to show it can be fairly

5

assumed that development in these infill areas will usually generate per capita VMT below the County average. Indeed, the County's own evidence indicates such development will typically yield VMT at or above the County average.

13. The paragraph commencing at the bottom of page 18 with "A similar analysis applies here" is modified to read:

A similar analysis applies here. The County has chosen to identify specific unincorporated areas as infill, where development can presumptively occur without performing a VMT analysis. But it has done so without providing any *evidence* that developing infill, as it has chosen to define it, would generally result in an insignificant transportation effect at the local county level.[fn.]

14. On page 19, after section C. of the Discussion, the first sentence beginning "Plaintiffs also challenge," change the word "less" to "fewer" so the sentence reads:

Plaintiffs also challenge the County's small project threshold—projects generating fewer than 110 daily vehicle trips—as lacking substantial evidentiary support.

15. The following appendices (A and B) will be added to the end of the opinion as pages 25 and 26:

Appendix A



Figure 14: County Village Areas that Overlap Infill Areas



Figure 8: VMT per Capita by Census Tract, Categorized by SANDAG Average VMT per Resident (21.85)

*Based on the SANDAG Series 13 Base Year Model, consistent with Rescinded Transportation Study Guidelines

October 20, 2021

CNFF v County_00023242

The petition for rehearing is denied.

There is no change in judgment.

DATO, Acting P. J.

Copies to:  All parties

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al., | D083555 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2022-00044215-CU-WM-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent. | |


APPEAL from an order of the Superior Court of San Diego County, Judge Joel R. Wohlfeil. Respondent's request for judicial notice is granted in part. Reversed.

Coast Law Group, Marco A. Gonzalez and Livia B. Beaudin, for Plaintiffs and Appellants.

Office of County Counsel, Michael P. Masterson, Deputy County Counsel, for Defendant and Respondent.

Agencies responsible for approving a land-use development project under the California Environmental Quality Act (CEQA) must address its potential significant environmental effects. To streamline this process, these agencies may create "thresholds of significance" to assist in determining whether an environmental effect caused by a project must be evaluated. In 2022, the County of San Diego (County) adopted thresholds of significance that, if met, would in most cases obviate the need for the developer of a proposed project to perform an analysis of vehicle miles traveled (VMT), the metric generally used to determine the significance of transportation-related environmental effects.

Plaintiffs, two environmental groups, appeal their unsuccessful challenge to two of those thresholds: (1) "infill" projects proposed to be built within the County's unincorporated villages (the infill threshold), and (2) projects that are expected to generate no more than 110 automobile trips per day regardless of where they are built (the small project threshold). Plaintiffs claim the infill threshold was adopted in violation of Public Resources Code section 21099, CEQA Guidelines, and guidance from the Governor's Office of Planning and Research (OPR) because it omits a numeric VMT target.[1] They also assert that both thresholds are based on unproven assumptions about transportation impacts unsupported by any substantial evidence. In particular, they argue there is no evidence to show that these assumptions are necessarily valid for San Diego County. We agree that

---

[1] All subsequent undesignated statutory references are to the Public Resources Code. We use "Guidelines" to refer to The Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.). Additionally, the relevant Guidelines refer to both land-use and transportation projects. Because only land-use projects are at issue, for efficiency, we will refer to them as "projects."

the record developed by the County fails to support the adopted thresholds, and on that basis we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Overview of the Relevant Aspects of CEQA*

"CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*Building Industry*).)  To meet these goals, public agencies follow a multistep process when planning a project that falls within CEQA's ambit.  (*Ibid.*) Relevant here is that this process requires determining whether a proposed project may have a *significant* environmental effect (*id.* at pp. 382–383), i.e., "a substantial, or potentially substantial, adverse change in the environment" (§ 21068).

The Guidelines, adopted by the California Natural Resources Agency, encourage public agencies to develop and publish thresholds of significance, with the aim of  promoting consistency in their significance determinations.[2] (Guidelines, § 15064.7, subds. (b), (d).)  A threshold of significance is used to predict when a certain environmental effect will normally be insignificant. It is defined as "an identifiable quantitative, qualitative or performance level

___

[2]    CEQA itself directs the agency to "certify and adopt the Guidelines that bind public agencies as they navigate the often technical and complex waters of CEQA." (*Building Industry*, *supra*, 62 Cal.4th at p. 390.)

3

of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant."  (*Id.*, subd. (a).)

**B.**    ***CEQA's Shift to VMT as a Metric to Assess Transportation-Related Environmental Effects***

In 2013, the Legislature adopted Senate Bill No. 743 (Senate Bill 743) as part of its years-long effort to "chart[ ] a course of long-term sustainability based on denser infill development, reduced reliance on individual vehicles and improved mass transit, all with the goal of reducing greenhouse gas emissions."  (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 729.)  One purpose of Senate Bill 743 was for VMT to replace traffic congestion and automobile delays as the main measure of transportation impacts under CEQA.  (Stats. 2013, ch. 386 (Sen. Bill 743), §§ 1, 5.)  To this end, section 21099, which was part of Senate Bill 743, directed OPR to propose Guidelines revisions that "establish[ ] criteria for determining the significance of transportation impacts" and suggested VMT and "automobile trips generated" as appropriate criteria.  (§ 21099, subds. (a)(7), (b)(1), (c)(1).)

Guidelines section 15064.3, on which plaintiffs heavily rely, was adopted pursuant to section 21099.[3]  (Guidelines, § 15004.)  It provides that "[g]enerally, [VMT] is the most appropriate measure of transportation impacts" where VMT is "the amount and distance of automobile travel

---

[3]    OPR's proposed revisions to the Guidelines were adopted in December 2018 and became effective on July 1, 2020.  (*Upland Community First v. City of Upland* (2024) 105 Cal.App.5th 1, 32.)  Other OPR-proposed revisions that were adopted include Guidelines sections 15064, subdivision (b)(2), and 15064.7, subdivision (d).  (Guidelines, § 15004.)

4

attributable to a project." (Guidelines, § 15064.3, subd. (a).) It also states that "VMT exceeding an applicable threshold of significance may indicate a significant impact. Generally, projects within one-half mile of either an existing major transit stop or a stop along an existing high quality transit corridor should be presumed to cause a less than significant transportation impact. Projects that decrease vehicle miles traveled in the project area compared to existing conditions should be presumed to have a less than significant transportation impact." (*Id.*, subd. (b)(1).)

Around the same time its revisions to the Guidelines were adopted, OPR published its "Technical Advisory on Evaluating Transportations Impacts in CEQA" (Technical Advisory) to make "recommendations regarding assessment of VMT, thresholds of significance, and mitigation measures."[4] The Technical Advisory is intended to be merely "a resource for the public to use at their discretion," and thus, OPR is "not enforcing or attempting to enforce any part of [its] recommendations." (*Ibid.*)

With respect to VMT, OPR observed that "the State has clear quantitative targets for [greenhouse gas] emissions reductions set forth in law and based on scientific consensus, and the depth of VMT reduction needed to achieve those goals has been quantified. . . . Therefore to ensure adequate analysis of transportation impacts, OPR recommends using quantitative VMT thresholds linked to [greenhouse gas] reduction targets when methods exist to do so." (Technical Advisory, *supra*, at p. 8.) OPR suggested that "a per capita or per employee VMT that is fifteen percent below that of existing development may be a reasonable threshold" when

4       Technical Advisory, *supra,* at page 1
<https://www.lci.ca.gov/docs/20190122-743_Technical_Advisory.pdf> (as of Mar. 27, 2025), archived at <https://perma.cc/244Q-FY5N>.

determining the significance of a specific project's transportation impacts (the 15 percent standard). (*Id.*, at p. 10.)

But OPR's Technical Advisory does not indicate that its 15 percent standard must be satisfied for every project. In some cases, thresholds of significance may be used "to quickly identify when a project should be expected to cause a less-than-significant impact without conducting a detailed study," i.e., without applying the 15 percent standard. (Technical Advisory, *supra*, at p. 12.) Thus, agencies may rely on appropriate thresholds to "screen out VMT impacts using project size, maps, transit availability, and provision of affordable housing." (*Ibid.*)

OPR suggested four screening thresholds based on these project characteristics: (1) "small projects . . . that generate or attract fewer than 110 trips per day"; (2) projects located in areas where VMT is already below the 15 percent standard (a so-called "low-VMT" threshold); (3) projects located within a half mile of either "a major transit stop" or a "stop along a high quality transit corridor"; and (4) projects consisting of 100 percent affordable housing built in infill locations. (Technical Advisory, *supra*, at pp. 12–15.) Only the second threshold incorporates OPR's 15 percent standard, and none of the other three includes any other numeric VMT target. (*Ibid.*) For projects not screened out of VMT analysis, OPR recommends that agencies aim to meet its 15 percent standard of per capita VMT for residential projects or per employee VMT for office projects. (*Id.*, at pp. 15–16.)

## C. *The County's Transportation Study Guide*

By resolution in September 2022, and following public review, the County adopted a Transportation Study Guide (Transportation Guide) that attempts to implement the changes called for by Senate Bill 743.

As recommended in the Technical Advisory, the County included in the Transportation Guide screening thresholds for general use that could obviate the need for a project-specific VMT analyses.[5] For a proposed project to which no threshold applies, the developer must conduct a "detailed evaluation of the VMT," and the County will deem significant a value above OPR's 15 percent standard. The County made a mapping tool available to model VMT impacts.

At issue in this appeal are the County's infill and small project thresholds.[6] The infill threshold is for "projects located in infill village areas" within the unincorporated County likely to be provided with transit in the future. "In-fill refers, both colloquially and for purposes of the Guidelines, to construction in areas that are largely developed[,] . . . 'typically but not exclusively in urban areas.' " (*United Neighborhoods for Los Angeles v. City of Los Angeles* (2023) 93 Cal.App.5th 1074, 1081 fn. 2.)

Accordingly, a consultant (infill consultant) identified infill areas within the County's unincorporated regions by using baselines of housing density, intersection density, and job accessibility associated with urban areas. Where an infill area's boundary was not coextensive with the boundary of a village within which the infill area was located, the County expanded the infill area's boundary to match that of the village.

---

[5] Significance thresholds for general use "must be adopted by ordinance, resolution, rule, or regulation, and developed through a public review process." (Guidelines, § 15064.7, subd. (b).)

[6] The following thresholds are not challenged: (1) projects in "VMT-efficient areas," which is the same as OPR's "low VMT threshold"; (2) projects located in transit-accessible areas; (3) locally serving retail or service projects or public facilities; (4) redevelopment projects that increase VMT efficiency as compared to the prior development; and (5) projects consisting of 100 percent affordable housing regardless of where they would be built.

7

Neither the County nor the infill consultant relied on any VMT analysis to identify the areas that would fall under this threshold.[7]

The County's small project threshold exempts from VMT analysis a residential or office project that is expected to generate fewer than 110 automobile trips. "Following guidance provided by OPR," the County wrote, "projects generating less than 110 daily vehicle trips . . . may be presumed to have a less than significant impact absent substantial evidence to the contrary."[8] The County observed that OPR's recommended small project threshold "was developed by evaluating projects across the State and was not developed based on a single jurisdiction." Nonetheless, the County took the position that OPR's version of this threshold need not "be adjusted based on the local jurisdiction's VMT or how it compares to the Statewide average."

The record on appeal contains a smattering of information concerning the VMT in the County. For purposes of measuring VMT impacts, the county-wide data was used as the comparison. By one measure, the per

---

[7]  Only two of the County's adopted thresholds—the challenged infill threshold and the unchallenged VMT-efficient-area threshold—define exempt projects by the geographic area in which they are located without reference to the accessibility of transportation. As previously noted, the VMT-efficient-area threshold was recommended by OPR and exempts from a VMT analysis projects located in areas that are at or below OPR's 15 percent standard. This means that a developer will need to invoke the infill threshold—which was not recommended by OPR—only if the project will be located in an area where per capita VMT is above the 15 percent standard, i.e., where the transportation effect is potentially significant.

[8]  "Absent substantial evidence indicating that a project would generate a potentially significant level of VMT, or inconsistency with a Sustainable Communities Strategy (SCS) or general plan, projects that generate or attract fewer than 110 trips per day[ ] generally may be assumed to cause a less-than-significant transportation impact." (Technical Advisory, *supra*, at p. 12, fn. omitted.)

capita VMT for the County was 21.85, which means that projects requiring this type of VMT analysis have a per capita VMT no higher than 18.57 to meet OPR's 15 percent standard. According to our review of the maps provided by the infill consultant and the County, the infill locations and associated villages generally had per capita VMT values higher than the County average (and much higher than OPR's 15 percent standard).

## D.    *The Trial Court Proceedings*

Shortly after the County adopted the Transportation Guide, plaintiffs filed a petition for writ of mandate in the superior court challenging the infill and small project thresholds. They contended, among other things, that the infill threshold was not authorized by CEQA because it is qualitative in nature, that is, it was not based on available VMT data. They also asserted the record did not contain substantial evidence that projects screened out of VMT analyses under either threshold would generally cause a less-than-significant environmental effect because the County's justifications consisted of assumptions that had not been shown to be valid for local conditions.

The County argued that the infill threshold was appropriately adopted under the discretion CEQA affords agencies to develop thresholds of significance. It also maintained that substantial evidence supported the adoption of the infill threshold because it was based on quantitative data—i.e., household and intersection density and job availability—and the generally accepted assumption that development projects in denser areas, such as infill, do not significantly impact VMT. The small project threshold should be upheld, the County asserted, mainly because it is identical to a threshold OPR recommended in its Technical Advisory.

In December 2023, the trial court issued judgment in the County's favor. In its written statement of decision, the court determined that the infill threshold was "consistent with [OPR's] 'Technical Advisory' and CEQA" and that the methods and assumptions the County used to define it constituted substantial evidentiary support. As for the small project threshold, the court noted that it was materially the same as OPR's recommendation and that substantial evidence "justif[ied] use of this metric in the local jurisdiction."

## DISCUSSION

### A. *Standard of Review*

"When a public agency takes a quasi-legislative action," such as adopting a threshold of significance, "judicial review of the action for CEQA compliance evaluates whether there was a prejudicial abuse of discretion." (*Golden Door Properties, LLC v. County of San Diego* (2018) 27 Cal.App.5th 892, 901 (*Golden Door*).) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) "We conduct an independent review to assess whether the public agency proceeded in the manner the law requires," and therefore, "[a] threshold of significance that is 'clearly erroneous and unauthorized' under CEQA must be set aside." (*Golden Door*, at pp. 901, 902.) We "afford deference to factual conclusions, as long as they are supported by substantial evidence." (*Id.* at p. 901.)

Our review is guided by several well-settled principles. In the absence of a threshold mandated by statute, the County "has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 192.)

10

We also "should afford great weight to the Guidelines when interpreting CEQA, unless a provision is clearly unauthorized or erroneous under the statute," an allegation neither party makes. (*Building Industry*, *supra*, 62 Cal.4th at p. 381.) And because OPR wrote both the Technical Advisory and Guidelines section 15064.3 heavily relied upon by plaintiffs, the former is relevant to interpreting the latter. (*Id.* at pp. 389–390 ["an agency's expertise and technical knowledge, especially when it pertains to a complex technical statute, is relevant to the court's assessment of the value of an agency interpretation"].)

## B.    *The Infill Threshold*

Attacking first the infill threshold, plaintiffs initially claim that the County erred as a matter of law by adopting a standard that does not quantitatively "evaluate a project's VMT or otherwise measure its transportation impacts in a manner required by Public Resources Code section 21099, Guidelines Section 15064.3, or the Technical Advisory." They argue that these authorities require a transportation-related significance threshold to incorporate OPR's 15 percent standard when, as here, quantitative VMT data is available. Because the infill threshold is qualitative in nature—it exempts projects from VMT analyses just because they would be built in certain areas—plaintiffs contend that it runs afoul of CEQA. Further, plaintiffs claim that substantial evidence is lacking for the adoption of this threshold on the theory that the County's justifications consist of assumptions and general policy considerations that have not been shown to be valid for local conditions.

The County counters that the infill threshold takes VMT into account because Senate Bill 743 creates a presumption that infill development is not VMT significant and that nothing in these authorities mandates any

11

particular methodology for accounting for VMT.  As for plaintiffs' arguments concerning the support for this threshold, the County contends that the statements plaintiffs rely upon are the considered opinions of its staff that can constitute substantial evidence.

1.     *CEQA does not prohibit a qualitative infill threshold as a matter of law.*

We can resolve plaintiffs' legal challenge to the infill threshold in short order.  Although plaintiffs recognize that the Guidelines expressly authorize qualitative thresholds for transportation impacts (see *ante*, at pp. 3–5), they argue that Guidelines section 15064.3, subdivision (b)(3) "allows agencies to rely on qualitative VMT analysis but only where existing models or methods are *not* available to estimate VMT."  This provision, however, relates to specific projects and not thresholds of significance.  By its terms it addresses the circumstance when quantitative data is unavailable to estimate the VMT "for the particular project being considered."  (Guidelines, § 15064.3, subd. (b)(3).)  Moreover, OPR's Technical Advisory recommends transportation screening thresholds based on qualitative project characteristics such as size, transit availability, and whether it consists of affordable housing.  (Technical Advisory, *supra*, at p. 12.)  Accordingly, as a conceptual matter, CEQA does not prohibit the County from adopting a qualitative infill threshold.  The more difficult question is whether the specific infill threshold the County chose to adopt is supported by substantial evidence.[9]

---

[9]     Section 21099 does not impose any obligations on the County.  Thus, we do not discuss this statute.

12

2.      *The infill threshold adopted by the County is based on assumptions not supported by substantial evidence showing that development consistent with the threshold will generally be VMT-insignificant under local conditions.*

The purpose of a significance threshold is to identify when an environmental effect would normally be deemed insignificant. (Guidelines, § 15064.7, subd. (a).) Plaintiffs claim that substantial evidence does not establish that the infill threshold adopted by the County accomplishes this purpose. In particular, they contend that the County *assumes* projects to which the infill threshold applies will cause a less-than-significant VMT impact merely because the Senate Bill 743-initiated focus on VMT was intended, in part, to promote infill development. In plaintiffs' view, the fact that infill development generally results in fewer VMT than non-infill development does not show that infill development, however defined, will be VMT insignificant. For its part, the County relies on the opinions of its staff that Senate Bill 743 was premised on a legislative conclusion that infill development will typically reduce VMT and greenhouse gas emissions.

A significance threshold adopted for general use must be supported by substantial evidence. (Guidelines, § 15064.7, subd. (b).) The Guidelines define substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) "Argument, speculation, unsubstantiated opinion or narrative, [or] evidence which is clearly inaccurate or erroneous . . . does not constitute substantial evidence." (*Ibid.*) Ultimately, substantial evidence must have a firm *factual* foundation. It "include[s] facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (*Id.*, subd. (b).) In reviewing for substantial evidence, we must "resolve all

13

conflicts in the evidence in support of the [agency's] action and indulge all reasonable inferences in favor of [its] findings." (*Hilltop Group, Inc. v. County of San Diego* (2024) 99 Cal.App.5th 890, 910.)

In the context of this case, the County was required to make some showing that development consistent with the adopted infill threshold will normally or likely result in an insignificant transportation effect.[10]  In other words, will development in infill and village areas, as defined by the County, *generally* result in per capita VMT that is insignificant, even if it does not *always* do so?  (See Guidelines, § 15064.7, subd. (a) [a threshold of significance predicts when the effect "will normally be determined to be significant"].)

The record contains several justifications by the County for the infill threshold, all of which are based on the general assumption that development in more dense areas, including infill development, does not significantly impact VMT.  Representative of these justifications is the following statement in the Transportation Guide:  "The switch from direct traffic impacts to a VMT analysis was adopted purposefully by the State legislature to promote infill development.  Accordingly, development located in infill areas would not be VMT significant under CEQA."  The County also opined in the Transportation Guide that "[d]evelopment in more dense areas with high job accessibility leads to more diversity in land use, demand for transit (bus and trolley) and multimodal infrastructure (walking and biking), and

---

[10]    This showing at the time a threshold is adopted is consistent with the requirement in the Guidelines that at the project stage, "the lead agency should briefly explain how compliance with the threshold means that the project's impacts are less than significant." (Guidelines, § 15064, subd. (b)(2).)  Further, such a showing appears feasible with respect to residential development, as the County made VMT modeling tools available and had determined the "total housing capacity within the infill areas is 3940 units."

14

shorter vehicle trips, which reduce greenhouse gases and VMT." Elsewhere in the record, the County characterized as "substantial evidence" supporting its adoption of this threshold the method its infill consultant used to identify infill locations.

Similar justifications support the County's decision to expand the boundaries of the infill areas to match the boundaries of any associated unincorporated village where the two boundaries were not coextensive—even though this expansion covered areas that did not meet its infill definition— by equating villages with infill. In the Transportation Guide, the County wrote that Village Areas "can be considered an infill location because those locations represent the areas within the county that have the most compact land use pattern (as compared to rural areas)." In response to a public comment that this expansion of the infill boundaries was "overly broad," the County wrote that "[t]he Village Buffer option . . . take[s] advantage of the higher densities and mixed-uses associated with the County villages . . . . The Village Buffer option builds upon the infill areas by including the entire boundary of the village and help account for inconsistencies with land-uses [*sic*] not adequately captured by the model but are otherwise consistent or have similar characteristics with the surrounding uses."

At the same time, the Transportation Guide also contains information casting doubt on the County's fundamental assumption that infill development will generally or most likely be VMT insignificant. Its appendix includes reports written by the County's infill consultant and by another consultant who was responsible for studying transportation expansion into the County's unincorporated areas (transportation consultant). The infill consultant, who provided the maps we referenced earlier (see *ante*, at pp. 8– 9), stated that defining appropriate screening criteria "would require

15

evidence to support the determination that projects in these locations would have a less than significant transportation impact and meet the intent of [Senate Bill] 743." The transportation consultant identified the same issue but concluded that "most locations within the County, even within suburban areas, tend to generate VMT at or about [rather than below] the regional mean." Both consultants' comments are consistent with our review of the maps in the record. In other words, rather than showing that infill development as defined by the County will normally or generally result in transportation effects that are VMT-insignificant, the evidence indicates just the opposite.

This brings us to a publication by the California Air Pollution Control Officers' Association (CAPCOA) that addresses how to mitigate greenhouse gas emissions and VMT, which the County contends provides substantial evidence for the infill threshold because County staff consulted it when preparing the Transportation Guide.[11] (Cal. Air Pollution Control Officers Assn., Handbook for Analyzing Greenhouse Gas Emission Reductions, Assessing Climate Vulnerabilities, and Advancing Health and Equity (Dec. 2021) (CAPCOA Handbook)). As it relates to VMT, the County observes that the CAPCOA Handbook "quantifies with mathematical precision" that VMT decreases with increased density, which is the principle underlying the infill threshold. Although that characterization is generally true, the Transportation Guide does not support the infill threshold with information

---

[11] The County requests that we take judicial notice of three exhibits under Rule 8.252 of the California Rules of Court: (1) the CAPCOA Handbook; (2) OPR's 2013 "Preliminary Evaluation of Alternative Methods of Transportation Analysis"; and (3) the County's response brief filed in connection with a challenge to a previous proposed Transportation Guide. We grant this request only with respect to the CAPCOA Handbook.

16

provided in the CAPCOA Handbook; in fact, it expressly exempts infill development from the handbook's VMT-related methodologies. Moreover, the CAPCOA Handbook neither defines infill nor describes density in a way that is analogous to how the County identified infill locations. Thus, the CAPCOA Handbook is not helpful to the County's case.

The evidence that the County's infill consultant warned "would [be] require[d]" is precisely what is missing here. Such evidence is absolutely necessary to support a conclusion that projects in defined infill locations would generally "have a less than significant transportation impact" in terms of VMT. It is not enough to say that infill development is better than non-infill development in terms of transportation impact or that increasing development density generally reduces VMT. The question is not a relative one, but rather one of significance versus insignificance as to the specific infill and village areas the County has identified where projects can be developed without the need for studying VMT impacts.

None of the "evidence" relied on by the County to support its assumptions concerning its infill threshold comes from independent outside sources or reflects anything other than unsubstantiated opinions about infill development generally. By definition, such opinions are not substantial evidence. (Guidelines, § 15384, subd. (a).) Although the County is correct that it may "rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 900), to be substantial, those opinions must be based on facts. The County made no attempt to establish facts showing how often development in its designated infill and village areas will not cause a significant transportation-related impact as measured by VMT.

17

Case law confirms our common sense interpretation of the Guidelines' requirements for significance thresholds. In *Golden Door*, we addressed whether there was substantial evidence to support a general-use threshold that incorporated a metric based on "statewide standards" for determining the significance of a project's greenhouse gas emissions. (*Golden Door*, *supra*, 27 Cal.App.5th at pp. 898, 904.) We explained that such a threshold "must be justified by substantial evidence to explain why it is sufficient for use in projects in the County." (*Id.* at pp. 904–905.) But the threshold at issue neither "address[ed] the County specifically" nor "explain[ed] why using statewide data is appropriate for setting the metric for the County." (*Id.* at p. 905.) Accordingly, we concluded that there was not substantial evidentiary support "explaining why statewide [greenhouse gas] reduction levels would be properly used in this context" and that, as a result, "the County fails to comply with CEQA Guidelines." (*Ibid.*, citing Guidelines, § 15064.7, subd. (c) [agency's adoption of another agency's threshold must be supported by substantial evidence].)

A similar analysis applies here. The County has chosen to identify specific areas as infill where development can occur without performing a VMT analysis, but it has done so without providing any *evidence* that developing infill, as it has chosen to define it, would generally result in an insignificant transportation effect at the local county level.[12]

---

[12] Because we agree with plaintiffs that the County did not tailor the assumption underlying the infill threshold to the areas it identified as infill (and the associated villages), we need not address their arguments that substantial evidence was lacking for the County's reliance on transit in selecting infill areas, that the County failed to take the steps required by section 21061.3 to designate the infill locations as "urbanized areas" (see *ante*, at p. 7, fn. 7), and that the village expansion of the infill areas will result in significant transportation impacts.

## C.   *The Small Project Threshold*

Plaintiffs also challenge the County's small project threshold—projects generating less than 110 daily vehicle trips—as lacking substantial evidentiary support.  They acknowledge that OPR has recommended a small project threshold based on statewide data, but they assert that the County has failed to support its adoption of this recommendation with evidence that projects screened out of VMT analysis under this threshold will likely cause a less than significant transportation effect *in San Diego County*.  The County responds by arguing that OPR's inclusion of a similar threshold in its recommendations provides the substantial evidentiary support necessary for us to uphold its adoption, especially considering that subdivision (c) of Guidelines section 15064.7 authorizes agencies to adopt another agency's significance threshold.  Citing *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 213 (*Biological Diversity*), the County also maintains that it need not provide evidence that the small project threshold is justified by local conditions because statewide goals may be used as significance thresholds.

The Guideline cited by the County allows agencies to adopt thresholds promulgated by other entities, but only if "the decision of the lead agency to adopt such thresholds *is supported by substantial evidence*."  (Guidelines, § 15064.7, subd. (c), italics added).)  And as we have already discussed (see *ante*, at pp. 17–18), substantial evidence in this context includes evidence that the threshold applies as intended in the local conditions.  *Biological Diversity*—which explained that a statewide criterion is an acceptable significance threshold only if there is substantial evidence to support its application to a specific project—is in accord.  (*Biological Diversity*, *supra*, 62 Cal.4th at pp. 226–227.)  Thus, the mere fact that OPR suggested or

19

recommended a small project threshold cannot, by itself, excuse the County's failure to provide *any* evidentiary support for the assumption that small projects as defined do not create significant transportation impacts under local conditions.[13]

Moreover, as we have already noted, the County acknowledged before the Transportation Guide was adopted that OPR's small project threshold "was developed by evaluating projects across the State and was not developed based on a single jurisdiction." (See *ante*, at p. 8.) The County proceeded on the belief that it did not need to take VMT into account when adopting this threshold. (See *ante*, at p. 8.) These statements make clear there was no effort by the County to develop any evidence that small projects generating 110 or fewer trips are likely to cause a less than significant transportation effect in San Diego County. This burden is not an onerous one, but it must be addressed. Our independent review of the rest of the record confirms that no such evidence was offered.[14]

---

[13]     In 2021, the County rescinded its previous Transportation Guide. In its defense of the current Transportation Guide, the County refers us to documents contained in the administrative record of the rescinded Transportation Guide indicating that in 2020, most of the housing construction was occurring in areas with short trip lengths. The County argues that this counts as "[c]ounty-specific analysis" to support the threshold. But where construction was occurring in the past generally, or at that point in time in particular, is insufficient absent evidence showing that conditions at the time the small project threshold was adopted remained the same.

[14]     We need not consider plaintiffs' arguments that substantial evidentiary support is lacking for the County's inclusion of residential developments in the threshold and that the threshold fails to account for the lengths of the trips that will be generated because those arguments are subsumed in our rationale for invalidating this threshold. Nor do we reach the County's

**DISPOSITION**

The judgment is reversed. The matter is remanded to the superior court with directions to vacate its denial of the petition for writ of mandate and to enter a new order granting the petition for writ of mandate consistent with the views in this opinion. Such order shall include only those mandates necessary to achieve compliance with CEQA in accordance with this opinion. Therefore, pursuant to subdivision (b) of section 21168.9, the superior court shall determine whether portions of the Transportation Guide are severable and may continue to be applied. Appellant is entitled to costs on appeal.


DATO, Acting P. J.

WE CONCUR:


DO, J.


KELETY, J.

---

argument that plaintiffs' concerns are "unfounded" because substantial evidence of a transportation-related effect will always have to be considered, even with a threshold of significance, due to the County's failure to support this argument with citations to authority. (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075.)